# United States Court of Appeals

## For the First Circuit

No. 03-1047

EILEEN GWYN, ON HER OWN BEHALF, AND AS EXECUTRIX
OF THE ESTATE OF HOWARD GWYN, and MARGARET DO,

Plaintiffs, Appellants,

v.

LOON MOUNTAIN CORPORATION,
d/b/a LOON MOUNTAIN SKI AREA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Boudin, Chief Judge,
Siler,[*] Senior Circuit Judge,
and Lynch, Circuit Judge.

Kevin M. Leach with whom Nixon, Raiche, Manning, Casinghino & Leach, P.C. was on brief for appellants.
Thomas Quarles, Jr. with whom Margaret O'Brien, Matthew R. Johnson and Devine, Millimet & Branch, P.A. were on brief for appellee.

November 25, 2003

_____

[*]Of the Sixth Circuit, sitting by designation.

**BOUDIN**, **Chief Judge**.     In this tragic case, two individuals were killed and a third badly injured in a skiing accident in New Hampshire.  The details are set forth in two very able opinions by the district court.  Thus, we confine ourselves to an abbreviated description focused on the two primary issues raised on this appeal: one is an important question of statutory construction and the other a narrower issue turning upon the pleadings.

Howard and Eileen Gwyn, their daughter Margaret Do, and Margaret's fiancé Mark Goss went on a ski vacation in Lincoln, New Hampshire.  On January 25, 1999, they spent the morning together skiing down easy trails at Loon Mountain Ski Area ("Loon").  Shortly before lunch, Howard, Margaret, and Mark--all very experienced skiers--left Eileen and rode the chairlift up to the Summit Lodge to ski down some more difficult trails.  Unbeknownst to them, Loon had closed one of the trails (named "Triple Trouble") the night before because of icy conditions, a closure noted on the trail board at the bottom of the mountain.

From the summit, it was possible to ski directly down a trail named Big Dipper from which, part way down, Triple Trouble branched off to the skier's right.  Or, from the summit, one could head right on a trail called Haulback, then take a left fork onto Cant Dog, and enter Big Dipper just above the point where Triple Trouble branched off to the right.  At this branching off point

from Big Dipper to Triple Trouble, Loon had posted a sign warning that Triple Trouble was closed. It had also placed a rope across the entrance to Triple Trouble.

From the summit, Howard led the group to the right down Haulback and then took a left turn onto Cant Dog. At the intersection of Cant Dog and Big Dipper--right above the closed Triple Trouble trail--Howard slipped on ice, slid under the rope blocking off Triple Trouble, and tumbled nine hundred feet down the icy slope. He suffered severe injuries resulting in his death a few days later. Margaret Do and Mark Goss saw Howard Gwyn fall, removed their skis, and attempted to walk down the closed trail to rescue him. Both fell, sliding hundreds of feet down Triple Trouble trail. Goss died. Margaret Do suffered severe injuries and frostbite but was rescued several hours later.

In this diversity suit, Margaret Do and Eileen Gwyn (as executrix of Howard Gwyn's estate and on her own behalf) sued Loon for breach of multiple common law and statutory duties. The district court granted Loon's motion to dismiss the majority of claims under New Hampshire's "Skiers, Ski Area, and Passenger Tramway Safety Act," N.H. Rev. Stat. Ann § 225-A (2002) ("ski statute"). Two claims survived the motion to dismiss, but after discovery the district court granted summary judgment to Loon on both counts. Plaintiffs appealed, focusing attention on one statutory claim and one claim of common law negligence.

At the crux of this appeal is New Hampshire's ski statute, N.H. Rev. Stat. Ann § 225-A. In this statute several duties are placed on ski operators--maintaining trail boards, marking the difficulty of various slopes, making trail maps available to all skiers--and operators can be sued for violations of these statutory duties. § 225-A:23; Nutbrown v. Mt. Cranmore, Inc., 671 A.2d 548, 553 (N.H. 1996). At the same time, the statute places the risk of injury from dangers inherent in the sport of skiing on the skiers themselves, and bars all actions against ski operators for injuries caused by these dangers.[1] § 225-A:24; Nutbrown, 671 A.2d at 553. New Hampshire case law is slowly filling in the gaps but uncertainties remain.

Here, most of the counts and theories pressed by plaintiffs at the start are no longer in issue, but two major claims remain open on this appeal. The first is that Loon did not comply with a statutory duty relating to marking closed trails. Under the ski statute, operators are not required to close a trail because of hazardous conditions, but if they do close a trail they must mark "the beginning of, and designated access points to" the

---

[1]The statute provides that "[e]ach person who participates in the sport of skiing accepts as a matter of law[] the dangers inherent in the sport, and to that extent may not maintain an action against the operator for any injuries which result from such inherent risks, dangers, or hazards." § 225-A:24; see also Nutbrown, 671 A.2d at 553 ("By participating in the sport of skiing, a skier assumes this inherent risk and may not recover against a ski area operator for resulting injuries.").

closed trail with a sign, § 225-A:23 (III)(b), and note the closure on a permanent trail board at the base of the mountain, § 225-A:23 (II)(a). Here, it is undisputed that Loon properly noted the closure on the trail board and properly marked "the beginning" of Triple Trouble at the point that it branched off Big Dipper.

Nevertheless, the plaintiffs say that a closed sign for Triple Trouble was also required by the statute at the uphill juncture where Cant Dog forked off Haulback--a point where a sign pointed the way to Big Dipper and Triple Trouble. This, they say, was itself an "access point" to Triple Trouble. Their causation theory is less clear: the implication is that such an early warning of a closed trail further downhill might have made Howard Gwyn decide to lead the group straight down Haulback instead of taking Cant Dog so they could avoid the entire region around the closed trail.

The district court ruled as a matter of law that "access points" as used in the New Hampshire statute referred to points of direct entry onto a trail, and did not include points above the start of the closed trail. Thus, the start of Cant Dog might conceivably be treated as an access point to Big Dipper since the former merged into the latter; once on Cant Dog, entry onto Big Dipper was inevitable. By contrast, nothing compelled one who took the fork to Big Dipper necessarily to take the fork from Big Dipper onto Triple Trouble.

We agree readily with the district court's reading of the statute. True, as a matter of dictionary definition a remote fork to an intermediate trail that can lead eventually to the closed trail could be described as a way to "access" the later trail; but on this theory the summit itself would be an access point to every connected trail on the mountain below. Indeed, on plaintiffs' reading, warning signs might have to be posted at a variety of different points wherever existing trail signs indicated that the closed trail could be reached somewhere downhill. Conceivably, plaintiffs' position could also require ski operators to construct such directional signs even if they did not already exist in order to mark every downhill closure.

It would not be literally impossible to comply with such requirements--apparently some ski slopes do so mark their closed trails, at least where existing signs mention the trails--but it could involve fairly complex compliance measures. In fact, the Loon trail map indicates that from some trails one could reach nearly 30 different trails below--some of them through open intermediate trails branching off into other open forks. The simplicity of the statute's requirements argue against an interpretation requiring ski operators to mark every one of those possibilities, and this interpretation is unnecessary to carry out what we perceive to be the rationale of the warning requirement.

In our view, the statute aims to give the skier warning of a trail closure at any point where the skier might otherwise commit himself to traverse the closed trail. This is a complete scheme of protection giving the skier both a comprehensive overview of all closures on the base trailboard, and specific notice of each closure at any point on the mountain where the skier has a last chance to avoid the closed trail.

This reading may leave some open issues, but it forecloses plaintiffs' central claim in this case. Here, the plaintiffs argue that a sign should have been placed at the Haulback-Cant Dog junction, since Cant Dog led onto Big Dipper which in turn led onto Triple Trouble. But a skier does not commit himself to taking Triple Trouble merely by turning left onto Cant Dog. Big Dipper was an open trail which a skier could continue down without branching off onto Triple Trouble, so no warning sign as to Triple Trouble was required by the statute at the Haulback-Cant Dog fork, even though one could have been voluntarily provided.

The second claim on appeal is that the district court should not have rejected an alternative theory of the plaintiffs having nothing to do with notice. The plaintiffs said that the defendant had placed the rope across Triple Trouble somewhat below the entrance itself and that the placement was negligent because it could lure a skier closer to the icy entrance than one would go

otherwise.  Admittedly, there was no duty to use any closing rope at all (the statute made the signs sufficient) but the plaintiffs argue that a voluntarily assumed duty negligently performed is not immunized by the statute.

There are obvious risks in penalizing efforts to provide help or care beyond an existing duty, but the common law rule sometimes permits a claim for negligent performance of a voluntary act where the negligence "increases the risk" of harm, or harm is caused by the victim's "reliance upon the undertaking" to provide help or care.  Restatement (Second) of Torts § 323 (1965); see also Prosser & Keaton on Torts 378-82 (5th ed. 1984).  The New Hampshire Supreme Court has not decided how far this doctrine may apply in the face of the state statute providing protection to ski operators.  See Rayeski v. Gunstock Area/Gunstock Area Comm'n, 776 A.2d 1265, 1269 (N.H. 2001).

The district court did not attempt to answer this question.  It rested its rejection of such a claim in this case on the fact that the plaintiffs had not articulated any plausible causal connection between the placement of the rope and Howard Gwyn's fall.  As the district court said:

> [The] complaint is devoid of allegations suggesting that defendant's failure to exercise reasonable care to perform the identified undertakings created the icy area where the falls took place, exacerbated an already dangerous situation, caused Howard Gwyn and Do to enter an area they would not have entered absent the undertakings, or

-8-

caused Howard Gwyn and Do to suffer worse
injuries than they would have suffered absent
the undertakings.

We have read the plaintiffs' appellate briefs with care and no
persuasive answer to this summary appears.

The problem for the plaintiffs is that Howard Gwyn
evidently slipped on an ice patch on Big Dipper, and an icy and
dangerous open slope is an inherent risk of skiing that the
plaintiffs assumed as a matter of law.  N.H. Rev. Stat. Ann §
225-A:24(I); Nutbrown, 671 A.2d at 553-54 (citing Fetzner v. Jiminy
Peak, The Mountain Resort, No. 94WAD16, 1995 WL 263916, at *2
(Mass. Dist. Ct. May 1, 1995) (slipping on ice is an inherent risk
of skiing)).  The only duty Loon voluntarily undertook--placing a
rope across the trail--put the plaintiffs in no worse a position
than they would have been without the rope.  One can think of
circumstances where a badly placed rope would cause or contribute
to an accident but this simply is not such a case.

Three remaining claims can be dealt with more swiftly.
First, plaintiffs say that as read by the district court (and now
by this court), the New Hampshire statute violates two provisions
of the New Hampshire Constitution: the right to a remedy and the
equal protection of the laws.  N.H. Const. part I, arts. 2, 12, 14.
The claim is that the district court's interpretation deprives the
plaintiffs of their constitutionally guaranteed rights without
giving them a sufficient quid pro quo of a prior warning of the

-9-

danger.   This argument may be forfeited since not raised below. Brigham v. Sun Life of Canada, 317 F.3d 72, 85 (1st Cir. 2003).

In any event the New Hampshire Supreme Court has already concluded that the obligations that the ski statute places on ski operators provide a sufficient quid pro quo for the statutory restriction on skiers' legal remedies.  Nutbrown, 671 A.2d at 552. While the "access points" issue was not considered in Nutbrown, this slight wrinkle would not be likely to alter the New Hampshire Supreme Court's assessment.   No further argument based on New Hampshire constitutional law is sufficiently developed to merit consideration.  See Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 43 (1st Cir. 1998).

Second, plaintiffs say that the statutory reading of the access points language and the voluntary assumption issue present open questions of New Hampshire law that should be certified to the state court.  No such request was made in the district court, which is ordinarily conclusive save in rare circumstances such as public policy concerns, e.g., Pyle v. S. Hadley Sch. Comm., 55 F.3d 20, 22 (1st Cir. 1995).  In any event, the access points issue is too straightforward to deserve certification and the voluntary assumption claim has been resolved not on the basis of statutory preemption but simply on the pleadings and facts of this case.

Third, plaintiffs say that the district court erred by denying them the chance to amend their complaint for the second

time (one earlier amendment had been made) two months after the deadline set by the district court's scheduling order.  The motion to amend was denied by the district court for failure to make any effort to satisfy the good cause requirement for amendments after the scheduling order deadline, Fed. R. Civ. P. 16(b)(1), and also the disregard of Local Rule 15.1's further requirements (e.g., attaching all relevant documents and explaining why the change had not been made before).  D.N.H. R. 15.1.

On appeal, the plaintiffs say only that the district court erred by applying federal standards for amending pleadings instead of the supposedly more liberal amendment rules applicable in New Hampshire state courts.  But if anything comprises "procedural" rulings exempt from the <u>Erie</u> doctrine, <u>Erie R.R. Co.</u> v. <u>Tompkins</u>, 304 U.S. 64 (1938), it is such routine issues as the granting or denial of extensions of time, leave to amend, and similar housekeeping concerns.  The outcome determinative test relied upon by plaintiffs has been limited, <u>see</u> <u>Hanna</u> v. <u>Plumer</u>, 380 U.S. 460, 471 (1965), and has no application to a clearly procedural matter governed by explicit federal procedural rules.

This is a sad case but, despite the ingenuity and energy of plaintiffs' counsel, it is not a close one, given the limitations imposed by state policy.  It was handled with care and competence by the district court, and we might have said less but

for a desire to make clear that plaintiffs' arguments have been considered with respect.

     <u>Affirmed</u>.