**Robert SMITH and Maria Dasilva**

v.

**Dwight JENKINS, Cherry Jenkins, Dorea Smith, Robert E. Kelley, Rkelley–Law, P.C., Louis G. Bertucci, EB Real Estate Group, Inc., Dorchester Real Estate, Inc., New England Merchants Corp., Union Capital Mortgage Business Trust, Mid City Mortgage, LLC, Fremont Investment & Loan, and Meritage Mortgage Corporation.**

**Civil Action No. 07–CV–12067–RGS.**

United States District Court,
D. Massachusetts.

June 16, 2009.

Jeffrey S. Baker, Baker & Associates, Jonathan D. Plaut, Chardon Law Offices, Boston, MA, for Plaintiffs.

Mary Alys Azzarito, Joel D. Hillygus, Joseph A. King, Murphy & Riley P.C., Alexandria E. Baez, John R. Bauer, Peter J. Moser, Amie R. Pelletier, Robinson & Cole LLP, Anthony R. Brighton, Douglas A. Robertson, Martin, Magnuson, McCarthy and Kenney, Jay S. Gregory, Thomas K. McCraw, Jr., Leclair Ryan, P.C., J. Patrick Kennedy, Daniel A. Leonardo, Bulkley Richardson & Gelinas LLP, Boston, MA, Geoffrey A. Domenico, Piscitelli, Domenico & Murphy, LLP, North Easton, MA, Christopher J. Fein, Fein Law Office, Braintree, MA, Michael J. Markoff, Falmouth, MA, James F. McLaughlin McLaughlin, McLaughlin & McLaughlin, Brockton, MA, for Defendants.

Donn A. Randall, Bulkley Richardson & Gelinas LLP, Boston, MA.

*MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS*

RICHARD G. STEARNS, District Judge.

This action arises out of an alleged real estate mortgage scheme perpetrated on plaintiffs Robert Smith and Maria Dasilva by the above-captioned defendants.[1] Eight of the defendants (in seven pending motions) have moved to dismiss various claims.[2] The court heard oral argument on November 14, 2008.

## BACKGROUND

### Smith's Allegations

Smith, who until recently resided at the New England Shelter for Homeless Veterans in Boston, suffers from schizophrenia, post-traumatic stress disorder, depression, and mild mental retardation. He graduated from high school in 1978 as a special needs student. His reading comprehension and writing skills are well below the proficiency levels of an average adult. In January of 2005, Smith was working as a trash collector for Waste Management Corporation (WMC) in the Fields Corner neighborhood of Dorchester. He was approached by Laurice Taylor, who told him that she worked in an EB Real Estate Group (RE/MAX) office on Dorchester Avenue. Taylor informed Smith that RE/MAX was sponsoring a special real estate investment program and asked Smith if he would like to join. When Smith said that he had no money to invest, Taylor re-

---

**1.** Plaintiffs allege that there are at least twenty other (unnamed) victims of the scheme, and point to similar cases pending in state court against some or all of the named defendants (their own cases included).

**2.** The motions to dismiss were provisionally denied and terminated by the court on July 15, 2008, to permit mediation, which did not

achieve a settlement. The defendants were then given leave to re-open the previously-filed motions. The eight defendants now before the court did renew the motions; defendant Louis Bertucci did not. Defendants Dwight Jenkins, Cherry Jenkins, and Dorea Smith have not moved to dismiss any of the the claims against them.

sponded that he needed neither money nor real estate experience to participate. Taylor told Smith that he could rely on RE/MAX's expertise and would not be required to make any personal decisions. Taylor gave Smith a business card and asked him to call.

Several days later, Smith called Taylor. She arranged a meeting at her office. There she told Smith that if he agreed to become part of the RE/MAX program, he would receive $10,000 for each investment made on his behalf. She reassured Smith that "RE/MAX would take care of everything." Taylor also told Smith that RE/MAX worked regularly with veterans.

Taylor asked Smith to provide copies of his latest W–2 statement and two recent pay stubs. Smith complied, and several days later, RE/MAX informed him that he had qualified for the program. RE/MAX told Smith that it would select investments for him, each of which would be of a year's duration. Smith was promised that he would make $10,000 per investment. According to Smith, "everyone" in the RE/MAX office encouraged him to get involved.[3]

In February of 2005, Taylor gave Smith directions to the Law Offices of Robert E. Kelley (Law Offices) in Braintree. Smith made an appointment on February 7, 2005. He was met at the Law Offices by defendant Louis Bertucci, who told Smith that he was the lawyer in charge of the paperwork for Smith's initial investment.[4] Smith believed that Bertucci was his lawyer. Taylor was also present, along with defendant Dwight Jenkins and an unidentified real estate broker from Dorchester Real Estate, Inc. (Century 21). Taylor and Jenkins told Smith that Jenkins was experienced in real estate matters, and that he would work with RE/MAX in managing Smith's investment. Taylor and Jenkins assured Smith that they would watch out for his interests.

Bertucci placed a stack of documents in front of Smith and told him to sign. Bertucci said that he had personally prepared the documents and that they were in order. Bertucci did not read or explain the documents to Smith. According to Smith, it was obvious to everyone present that he did not understand the contents of the documents. Nonetheless, he was led by Bertucci, Taylor, Jenkins, and the Century 21 agent to believe that he was making a good investment and that they would "take care of everything." After Smith signed the documents, he was told that he would receive $10,000 in a few days time.

The documents that Smith had signed were real estate closing documents, promissory notes, and mortgage agreements obligating him to the purchase of a residence in Dighton, Massachusetts. Smith had unknowingly borrowed $411,964.24 secured by two mortgages issued by defendant Fremont Investment and Loan (Fremont). Defendants earned thousands of dollars in fees from the transaction, including $42,000 borrowed to pay a "contract release" fee to Jenkins.

The mortgages were issued to Smith pursuant to an application prepared and submitted to Fremont by defendant New England Merchants Corporation (NEMC).

---

3. In addition to Taylor, Smith dealt with a Starr Mosley and an unnamed Asian man who appeared to be the manager of the RE/MAX office. When Smith told the Asian man that he worked for WMC, the man stated that RE/MAX had just partnered a similar investment with another WMC employee.

4. Bertucci was employed by defendant Robert E. Kelley, the named principal of the Law Offices.

In late January of 2005, RE/MAX and Jenkins had forwarded Smith's W–2 form and pay stubs to NEMC. The application contained numerous false statements, among them: (1) that the application had been completed in a face-to-face interview; (2) that Smith's monthly income was $7,500 (or $90,000 per year); (3) that Smith had two separate bank accounts totaling $18,500; (4) that Smith had completed fourteen years of school; (5) that he had rented his current residence for five years; (6) that he had been employed by WMC for four and one-half years; (7) that he had a net worth of $397,037; and finally, (8) that he intended to occupy the Dighton property as his primary residence.

On February 22, 2005, Smith was summoned to the RE/MAX office to collect the $10,000 payment. There he was told to sign an additional document. Unbeknownst to Smith, the document was a power of attorney giving Jenkins complete control of the Dighton property. Several days later, Smith was contacted by RE/MAX and offered the opportunity to participate in a second investment. Smith agreed and was instructed to return to the Law Offices. He did so on February 28, 2005. An Ivana Foley from Century 21 was present. She informed Smith that she would be working with Jenkins and RE/MAX in managing the new investment. Bertucci again presided at the closing, advising Smith that he was representing Smith's interests in the transaction and that he had personally verified the accuracy of the documents Smith was to sign. Bertucci did not explain the documents to Smith, and discouraged him from reading them.

Upon signing the second set of documents, Smith had unknowingly borrowed $437,198.13 secured by two mortgages from defendant Meritage Mortgage Corporation (Meritage) for the purchase of a residence on West Cottage Street in Boston. Jenkins received a $41,500 "contract release" fee. Century 21 received a broker's commission of $18,950. Smith's financial documents had been forwarded by RE/MAX to defendant Union Capital Mortgage Business Trust (Union Capital), who completed the loan application. This application also contained numerous false statements: (1) that it had been prepared during a face-to-face interview with Smith; (2) that Smith had completed sixteen years of school; (3) that he had rented his current home for the past two years; (4) that he had spent twenty years at his job; (5) that he had an income of $8,516 per month, or $102,912 per year; (6) that he intended to occupy the Boston property as his primary residence; and finally (7) the Dighton mortgages were not listed in the application as among Smith's liabilities.

Several months after the closings, Smith began receiving phone calls from banks regarding missing mortgage payments. In addition, tenants called to complain that their utility bills had not been paid.[5] RE/MAX, Jenkins, and Taylor assured Smith that they would take care of the matter. However, the calls persisted. Eventually, the Dighton and Boston properties went to foreclosure. Smith is now liable for over $800,000 in borrowed debt, and his credit has been ruined. Smith, as a result, suffers from depression, stomach problems, and high blood pressure.

*Dasilva's Allegations*

In November of 2004, Jenkins approached Dasilva, who was then employed as a security guard. Jenkins asked Dasilva if she would be interested in making money by investing in real estate. Jenkins

---

5. Any rents collected at the properties by defendants were not paid to Smith, nor were they used to pay down the mortgages.

informed Dasilva that he was in the business of identifying prospective investors with good personal credit who could purchase residential properties in their own name. Jenkins told Dasilva that she would receive $20,000 for each property she bought—$10,000 upon the purchase, and $10,000 upon the eventual sale. Jenkins explained that he would select choice properties for Dasilva to buy and would also arrange the financing. Jenkins assured Dasilva that after the purchases, he would take responsibility for collecting rents, paying the mortgages, and performing maintenance and repairs. He would also handle the sale of the properties. Jenkins told Dasilva that she could trust him because of his real estate experience. He also stated that he and his lawyer would be present at the closing to ensure that all documents were in order.

In late November or early December of 2004, Jenkins advised Dasilva that he had found an excellent investment property in Brockton. Jenkins instructed Dasilva to provide her financial information to Union Capital for financing purposes. On December 30, 2004, Dasilva went to the Law Offices to sign the closing documents. Bertucci again presided. Dasilva did not understand the contents of the documents Bertucci placed in front of her, and felt nervous about being rushed into their signing. Bertucci knew that Dasilva had no real understanding of the transaction, but nonetheless encouraged her to sign the documents without reading them.

Prior to the closing, Union Capital had completed Dasilva's loan application, false-

6. According to plaintiffs, Union Capital knew that there was no such entity as OneWorld OneLink.

7. Mid–City falsely represented to the lender that Dasilva intended to occupy the Whitman property as her primary place of residence; that she had worked for OneWorld OneLink for three years; and that she earned $7,000

ly stating: (1) that Dasilva had been interviewed by mail; (2) that she intended to occupy the property as her primary place of residence; (3) that her income was $9,529 per month, or $114,348 per year (in reality, Dasilva at the time earned $15 per hour); (4) that Dasilva had sixteen years of schooling; (5) that she owned $21,345 in a bank account; and (6) that she worked as the operations manager of a car dealership owned by OneWorld OneLink (in reality, a fictitious business created by Jenkins using his mother's and sister's address).[6]

Approximately one week later, Jenkins informed Dasilva that he had found another suitable investment for her in Whitman, Massachusetts. On January 7, 2005, Dasilva went to an unidentified lawyer's office at Jenkins's instruction. In the now familiar scenario, Dasilva received 100 percent financing based on a false mortgage application completed by defendant Mid–City Mortgage, LLC (Mid–City).[7]

After the closings, Jenkins failed to collect rents or maintain the properties. The tenants of the Brockton property began to telephone complaints to Dasilva. Calls from banks regarding unpaid mortgage bills soon followed. Both of Dasilva's properties have been foreclosed. Dasilva has had her credit ruined and suffers from stomach problems, headaches, sleeping problems, and stress.

## DISCUSSION

### Count I—(Fraud)

■ To state a claim for fraud in Massachusetts, a plaintiff must allege that "(1)

per month as a base salary and an additional $900 per month in other income. Mid–City also did not disclose Dasilva's liability for the Brockton property. The Amended Complaint sets forth neither the amounts borrowed by Dasilva, nor the lender(s) from whom she received mortgages.

the defendant made a false representation of material fact, (2) with knowledge of its falsity, (3) for the purpose of inducing the plaintiff to act in reliance thereon, (4) the plaintiff relied upon the representation, and (5) the plaintiff acted to his detriment." *Armstrong v. Rohm & Haas Co., Inc.,* 349 F.Supp.2d 71, 81 (D.Mass.2004). *See also Bishay v. Foreign Motors, Inc.,* 416 Mass. 1, 12, 616 N.E.2d 96 (1993); *Nei v. Burley,* 388 Mass. 307, 311, 446 N.E.2d 674 (1983).

■■■ Fraud and deceit must be plead with particularity—Rule 9(b) is the exception to the rule that on a 12(b)(6) motion to dismiss, a plaintiff is to be given the benefit of the doubt. *Equip. & Sys. for Indus., Inc. v. Northmeadows Constr. Co., Inc.,* 59 Mass.App.Ct. 931, 932, 798 N.E.2d 571 (2003). "In all averments of fraud or mistake, the circumstances constituting fraud or mistake, duress or undue influence, shall be stated with particularity." Fed. R. Civ. P. 9(b).[8] The heightened pleading standard of Rule 9(b) is satisfied by an averment "of the who, what, where, and when of the allegedly false or fraudulent representation." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.,* 374 F.3d 23, 29 (1st Cir.2004). The specificity requirement "extends only to the particulars of the allegedly misleading statement itself. The other elements of fraud, such as intent and knowledge, may be averred in general terms." *Rodi v. S. New England Sch. of Law,* 389 F.3d 5, 15 (1st Cir.2004) (internal citations omitted). The court will address each of the moving defendants in turn.

*Kelley and the Law Offices*

■■■ Both Smith and Dasilva assert fraud claims against Kelley and the Law Offices based on Bertucci's conduct and the doctrine of respondeat superior. Plaintiffs have satisfactorily stated claims of fraud against Bertucci. Smith alleges that at the February 7, 2005 closing on the Dighton property, Bertucci "introduced himself as the lawyer who was handling the paperwork for the investment." Compl. ¶ 26. Smith states that Bertucci gave him a stack of documents to sign and "advised Mr. Smith that he [(Bertucci)] had prepared the documents and that they were all in proper order." Compl. ¶ 29. Smith further alleges that Bertucci "advised [him] to sign the documents" without explaining their contents. *Id.* With respect to the February 28, 2005 closing on the Boston property, Smith alleges that "Bertucci again advised Mr. Smith that he was protecting Mr. Smith's interests in this transaction and that he [had] personally ensured the documents were properly prepared." Compl. ¶ 43.

■■■ One who signs a contract will ordinarily be held to its terms whether or not he or she reads it or claims to have not understood its provisions. *Spritz v. Lishner,* 355 Mass. 162, 164, 243 N.E.2d 163 (1969). Here, however, where Smith has pled a lack of mental capacity that should have been obvious to his interlocutors, as well as the "who, what, where, and when of the allegedly false or fraudulent representation[s]," he has set forth "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Greenstone v. Cambex Corp.,* 975 F.2d 22, 25 (1st Cir.1992). The same is true with regard to Dasilva's allegations. While her claim

---

**8.** Federal pleading Rule 9(b) applies, even though the claim is asserted under state law. *See Gwyn v. Loon Mountain Corp.,* 350 F.3d 212, 218 (1st Cir.2003), citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In any event, the state and federal pleading standards are virtually identical. *See Northmeadows,* 59 Mass.App.Ct. at 932, 798 N.E.2d 571.

differs slightly from Smith's (she claims lack of understanding while he claims a lack of capacity to understand), whether she should be held responsible for signing the mortgage documents is an issue to be determined by the finder of fact.

■■ Whether Kelley and the Law Offices are liable for Bertucci's actions under a theory of respondeat superior is also not an issue that can be determined as a matter of law. "Broadly speaking, respondeat superior is the proposition that an employer, or master, should be held vicariously liable for the torts of its employee, or servant, committed within the scope of employment." *Dias v. Brigham Med. Assocs.*, 438 Mass. 317, 319–320, 780 N.E.2d 447 (2002). While the existence of a master-servant relationship is ordinarily a question of fact, *Peters v. Haymarket Leasing, Inc.*, 64 Mass.App.Ct. 767, 773, 835 N.E.2d 628 (2005), once the employment relationship is established, there is no need for any further analysis of the employer's right of direction and control; all that remains is to determine whether the tort occurred within the scope of employment. *Dias*, 438 Mass. at 322–323, 780 N.E.2d 447. Plaintiffs allege, and defendants do not dispute, that at the time of the closings, Bertucci was employed by Kelley and the Law Offices. If the factfinder determines that Bertucci was acting within the scope of that employment, defendants will be liable for his torts. *Id.* at 322, 780 N.E.2d 447. "This comports with traditional agency law that '[a]n employer is liable for torts committed by employees while acting in the scope of their employment.' Restatement (Third) of Agency § 2.04 (Tent. Draft No. 2 2001)." *Id.* The Kelley defendants' motion to dismiss will therefore be *DENIED* as to the fraud claims.

### EB Real Estate (RE/MAX)

■ RE/MAX argues that it was not a direct participant in the real estate transactions and that it cannot be held liable for the conduct of independent contractors who had neither apparent nor implied authority to act on RE/MAX's behalf. Smith, however, alleges that Taylor (a RE/MAX employee) told him that RE/MAX "would take care of everything," and that he agreed to participate in the investment scheme based on the representations of Taylor and other RE/MAX employees that he would personally benefit by doing so. Whether Taylor and the others (all of whom are alleged to have known of Smith's diminished capacity), had the authority to bind RE/MAX is an issue for the finder of fact. *Trans Nat'l Commc'ns, Inc. v. Overlooked Opinions, Inc.*, 877 F.Supp. 35, 44 (D.Mass.1994) ("The existence and extent of an agency relationship is ordinarily a question of fact to be decided by a jury."); *White's Farm Dairy, Inc. v. De Laval Separator Co.*, 433 F.2d 63, 66 (1st Cir.1970) ("In Massachusetts the proof of agency is held to be ordinarily a question of fact for the jury . . . to be determined from all the evidence and reasonable inferences to be drawn therefrom.") (internal citations omitted). *See also Shear v. Gabovitch*, 43 Mass.App.Ct. 650, 670, 685 N.E.2d 1168 (1997). The motion to dismiss the fraud claims against RE/MAX will consequently be *DENIED*.

### Century 21

■ The same analysis applies to Century 21. In the Amended Complaint, Smith alleges that Century 21 representatives "led [him] to believe that this was a good investment, that he could put his trust in them . . . ," and that it was "obvious and apparent" to those present that he had no actual understanding of the transaction. Smith claims that both of the Cen-

tury 21 brokers with whom he dealt assured him that he was making "hands off" investments that were to his benefit.

 Smith's inability to provide the name of one of the Century 21 brokers is not fatal to his claim. At the initial phases of a case, the civil law takes a permissive view of the propriety of "John Doe" pleading when the identity of a party can only be ascertained through discovery. *See Wilson v. Town of Mendon,* 294 F.3d 1, 7 n. 16 (1st Cir.2002). Once that identity is learned, a plaintiff is permitted under the liberal regime of Rule 15 to amend the complaint to substitute the name of the real party. *See, e.g., Carmona v. Toledo,* 215 F.3d 124, 136 (1st Cir.2000). The principle has special force here where Smith is seeking not to adjudicate the rights or liabilities of the unnamed Century 21 agent, but those of Century 21 itself for whom "Jane Doe" is alleged to have acted as an agent. Smith's fraud claim against Century 21 will therefore survive.

### NEMC, Mid–City, and Union Capital

 Plaintiffs have pled with particularity that these three mortgage brokers engaged in fraud. Smith alleges that NEMC made numerous false statements in the loan application for the Dighton property, knowing that he had no meaningful grasp of the transaction, that he did not qualify for the mortgage loans, and that he would be unable under any circumstances to repay the debt.[9] Similarly, Dasilva alleges that Mid–City knew that the application it submitted to the lender on the Whitman property contained numerous

false statements, including exaggerations about her educational level, salary, employment history, and ability to repay. Finally, plaintiffs allege that Union Capital acted in a fraudulent manner with respect to Smith's Boston and Dasilva's Brockton loans. Plaintiffs allege numerous false statements made by Union Capital on their respective mortgage applications.[10] Therefore, the three mortgage brokers' motions to dismiss the fraud claims will be *DENIED.*

### Count II–Violation of Massachusetts Mortgage Broker Regulations

 Plaintiffs assert Count II against NEMC, Union Capital, and Mid–City. The Massachusetts mortgage broker regulations, 209 C.M.R. §§ 42.00 et seq., do not authorize a private cause of action. Although violation of the regulations might lend support to a cause of action under Mass. Gen. Laws ch. 93A, that possibility has no bearing on the viability of Count II, which will be *DISMISSED* in its entirety.

### Count III—Violation of the Federal Truth in Lending Act (TILA)

 Smith asserts Count III against Fremont and Meritage. To the extent that Count III seeks rescission, such relief is not available to Smith under TILA. *See* 15 U.S.C. § 1635(e). *Cf. Worcester Heritage Soc'y, Inc. v. Trussell,* 31 Mass.App.Ct. 343, 345, 577 N.E.2d 1009 (1991). Moreover, the fact that the purchase money properties have been foreclosed precludes an order of rescission. *See* 15 U.S.C. § 1635(f).[11] A cause of ac-

---

9. The Attorney General of Massachusetts has filed suit against NEMC alleging a variety of illegal money lending practices.

10. Moreover, Dasilva alleges that Union Capital was fully aware of Jenkins's fraudulent business practices, and knew that he routinely

used the "OneWorld OneLink" entity to perpetrate fraud.

11. *See also Walsh v. Chestnut Hill Bank & Trust Co.,* 414 Mass. 283, 288, 607 N.E.2d 737 (1993) (a party requesting recission " 'must restore or offer to restore all that he has

tion for money damages under TILA may be available if Smith is able to overcome a statute of limitations defense asserted by Fremont. Under Massachusetts law, "[f]actual disputes concerning the date on which the plaintiff knew or should have known of his cause(s) of action are resolved by a jury." *Wolinetz v. Berkshire Life Ins. Co.*, 361 F.3d 44, 48 (1st Cir. 2004).[12] Insofar as Count III seeks rescissionary relief, it will be *DISMISSED*. The claim for money damages will be reserved for trial.

### Count IV—Regulation Z

█ Smith asserts Count IV against Fremont and Meritage. Although a failure to comply with the disclosure requirements of Regulation Z may constitute a violation of TILA,[13] Regulation Z is merely an implementing regulation and does not authorize a private cause of action. 12 C.F.R. § 226.1(e); *see Santos–Rodriguez v. Doral Mortgage Corp.*, 485 F.3d 12, 14 (1st Cir.2007). Count IV will be *DISMISSED*.

### Count V—Mass. Gen. Laws ch. 140D §§ 1 et seq., and 209 C.M.R. 32.00 et seq.

█ Smith asserts Count V against Fremont and Meritage. To the extent that this claim is construed to seek rescissionary relief under the Massachusetts laws governing lending and disclosure requirements, such relief is not available to Smith for the reasons stated with respect to Count III. *See* Mass. Gen. Laws ch.

140D § 10(e)-(f). A cause of action for damages under this statute is potentially available to Smith. As to the prayer for rescissionary relief, Count V will be *DISMISSED*. The claim for money damages will survive.

### Count VI—Mass Gen. Laws ch. 93A

█ Jenkins and Dasilva allege Count VI against all defendants. Chapter 93A provides equitable relief for unfair and deceptive acts in the conduct of consumer transactions. "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact ... the boundaries of what may qualify for consideration as a G.L. ch. 93A violation is a question of law." *R.W. Granger & Sons, Inc. v. J & S Insulation, Inc.*, 435 Mass. 66, 73, 754 N.E.2d 668 (2001). Chapter 93A distinguishes between "a business person and an individual who participates in commercial transactions on a private, nonprofessional basis." *Lantner v. Carson*, 374 Mass. 606, 610, 373 N.E.2d 973 (1978). Deceptive consumer transactions are actionable under section 9, while questionable commercial transactions are actionable under section 11. Here, Smith pleads claims under both sections 9 and 11, while Dasilva purports to be a commercial claimant under section 11.

The question of whether a private individual's participation in an isolated transaction takes place in a "business context" must be determined from the

---

received' through the contract") (citations omitted).

**12.** A motion to dismiss may be granted only "when the pleader's allegations leave no doubt that an asserted claim is time-barred." *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir.1998).

**13.** *See Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 376, 93 S.Ct. 1652, 36 L.Ed.2d

318 (1973) (in discussing the imposition of civil penalties under TILA for failure to comply with Regulation Z, the Court noted Congress's emphasis on agency rulemaking and on private and administrative enforcement of the TILA, and stated "we cannot conclude that Congress intended those who failed to comply with regulations to be subject to no penalty or to criminal penalties alone.").

circumstances of each case. To establish a private person's liability under [section 11] we assess the nature of the transaction, the character of the parties involved, and the activities engaged in by the parties. Other relevant factors are whether similar transactions have been undertaken in the past, whether the transaction is motivated by business or personal reasons (as in the sale of a home), and whether the participant played an active part in the transaction. *Begelfer v. Najarian,* 381 Mass. 177, 190, 409 N.E.2d 167 (1980) (internal citation omitted). Here, although Dasilva intended to buy the properties as a business investment and not for personal use, the nature of the underlying transactions compel a finding that her claims are more properly brought as consumer claims. This is because Dasilva's involvement "in the real estate transaction[s] ... was minimal. [She] had no voice in negotiating the terms of the loan. The payments were made to an agent and not directly to [her]. [She was] solicited by [Jenkins] to participate in the loan, and [was] not active in the management of the loan." *Id.* at 191, 409 N.E.2d 167. Therefore, her claim for relief under section 11 of Chapter 93A will be *DISMISSED.* The same reasoning applies to Smith's section 11 claim, and it will also be *DISMISSED.*

Smith's section 9 claim requires that he plead that a 30–day demand letter was sent to defendants. A demand letter is a condition precedent of a section 9 action. *Spilios v. Cohen,* 38 Mass.App.Ct. 338, 342, 647 N.E.2d 1218 (1995). Smith's general averment in paragraph 62 of the Amended Complaint that he "wrote a demand letter to the defendants ... [and] [d]espite the

passage of thirty days, none of the defendants made a reasonable offer of settlement" is sufficient to survive Union Capital's and Century 21's motions to dismiss the Chapter 93A claims on the factual claim that the letters were never received.[14] The issue of the sufficiency of Smith's demand letters is a matter for summary judgment. *See Spilios,* 38 Mass. App.Ct. at 342, 647 N.E.2d 1218.

### Count VII—Negligence

■ Jenkins and Dasilva assert Count VII against Kelley, the Law Offices, RE/MAX, Century 21, NEMC, Union Capital, and Mid–City. Whether a person owes a duty to another (a prerequisite for a finding of negligence) is a question of law. *Coughlin v. Titus & Bean Graphics, Inc.,* 54 Mass.App.Ct. 633, 638, 767 N.E.2d 106 (2002). The essence of plaintiffs' negligence claim, however, is fact specific, and, therefore, does not lend itself to determination by the court on a motion to dismiss. The motions to dismiss as to Count VII will therefore be *DENIED.*

### Count VIII—Breach of Contract and the Covenant of Good Faith and Fair Dealing

■ Smith asserts Count VIII against RE/MAX and Century 21. Generally, "the question of whether a contract has been formed between two parties is a question of fact to be determined by the fact finder." *Crellin Techs., Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 7 (1st Cir. 1994). Smith alleges that RE/MAX and Century 21 had a contractual duty (originating with Jenkins) to manage and maintain his properties, collect the rents, deal with the tenants, pay the utility bills and

---

14. Union Capital concedes in its opposition that Smith's allegation is sufficient to survive a motion to dismiss on pleading sufficiency grounds. The court declines to take judicial notice of the "public disclosures" urged by Union Capital as an alternative ground for dismissing Smith's Chapter 93A claim. *See LoCicero v. Leslie,* 948 F.Supp. 10, 12 (D.Mass.1996).

mortgages, and sell the properties in a businesslike manner, but failed to do so.[15] Smith has adequately alleged a contractual promise, a duty, and a failure to perform. That the contract was not in writing is not fatal. Even an indefinite oral contract may be enforceable. *See Meng v. Trustees of Boston Univ.*, 44 Mass.App.Ct. 650, 652, 693 N.E.2d 183 (1998).

■■■■■■■ "The duty of good faith and fair dealing concerns the manner of performance." *Uno Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385, 805 N.E.2d 957 (2004). The covenant reflects an implied condition that inheres in every contract "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471–472, 583 N.E.2d 806 (1991). "The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Rests.*, 441 Mass. at 385, 805 N.E.2d 957.[16] Where no contract exists, there can be no breach of the implied covenant of good faith and fair dealing. *Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 230 (1st Cir.2005). The claim for violation of the covenant of good faith and fair dealing depends in part on whether Smith ultimately can prove the existence of a contract. The motions to dismiss Count VIII will be *DENIED*.

*Count X—Unjust Enrichment*

■■■■■■■ Unjust enrichment is a theory of equitable recovery, not a separate cause of action. *Lopes v. Commonwealth*, 442 Mass. 170, 179, 811 N.E.2d 501 (2004). Under the doctrine of unjust enrichment, a plaintiff seeks restitution of a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable. To satisfy the five elements of unjust enrichment, a plaintiff must show: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law." *LaSalle Nat'l Bank v. Perelman*, 82 F.Supp.2d 279, 294–295 (D.Del.2000). Where a contract governs the parties' relationship, the contract provides the measure of the plaintiff's right and no action for unjust enrichment lies. *McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1091 (9th Cir.2003). This principle is simply an extension of the fifth element of the doctrine, that where a plaintiff has an adequate remedy at law, a claim of unjust enrichment is unavailable. *See id.* at 1093 (Delaware law); *Massachusetts v. Pace*, 616 F.Supp. 815, 822 (D.Mass.1985) (federal common-law); *Popponesset Beach Ass'n, Inc. v. Marchillo*, 39 Mass.App.Ct. 586, 593, 658 N.E.2d 983 (1996) (Massachusetts law). The court understands that pleading in the alternative is a not uncommon practice in the early stages of litigation. While this claim may proceed, plaintiffs must eventually make an election between a remedy at law and one in equity. *See*

---

**15.** Dasilva brings this claim against Jenkins only, and alleges that he failed to meet his contractual obligations to manage her properties. Jenkins has not moved to dismiss the claim.

**16.** The breach of the covenant of good faith claim is inherent in a contract claim and need not be pled independently. *See Warner Ins. Co. v. Comm'r of Ins.*, 406 Mass. 354, 362 n. 9, 548 N.E.2d 188 (1990).

*Rodriguez–Suris v. Montesinos*, 123 F.3d 10, 20 (1st Cir.1997).

### Count XI—Breach of Fiduciary Duty

 This claim is asserted against the Kelley defendants, Bertucci, and RE/MAX.[17] According to Smith, he was lured into entering into the transactions because of misplaced trust in defendants' representations that they were acting in his best interest. However, "[t]he plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature. The catalyst in such a change is the defendant's knowledge of the plaintiff's reliance upon him." *Broomfield v. Kosow*, 349 Mass. 749, 755, 212 N.E.2d 556 (1965). "Whether a relationship of trust and confidence exists is a question of fact. . . . The relationship may be found on evidence indicating that one person is in fact dependent on another's judgment in business affairs or property matters." *Collins v. Huculak*, 57 Mass.App.Ct. 387, 395, 783 N.E.2d 834 (2003) (internal quotation marks and citations omitted). Factors to consider include "the relation of the parties prior to the incidents complained of, the plaintiff's business capacity or lack of it contrasted with that of the defendant, and the readiness of the plaintiff to follow the defendant's guidance in complicated transactions wherein the defendant has specialized knowledge." *Broomfield*, 349 Mass. at 755, 212 N.E.2d 556. Smith was indisputably a novice at real estate investment, and he additionally claims that defendants were fully aware that he did not have the capacity to understand the underlying transactions. Indeed, the allegations in the Amended Complaint portray a scenario in which defendants intentionally preyed upon Smith, whose trust was easily earned. "As Judge Cardozo once put it, 'When property has been acquired in such circumstances that the holder of the legal title may not in good conscience obtain the beneficial interest, equity converts him into a trustee.'" *Id.* at 757–758, 212 N.E.2d 556 (citation omitted). Smith has sufficiently pled a claim for breach of fiduciary duty against all defendants named.[18] The motions to dismiss Count XI will be *DENIED.*

---

**17.** While Dasilva pleads this claim against Jenkins, the lack of a motion to dismiss from Jenkins obviates the need for discussion.

**18.** It is unclear whether the fiduciary claims asserted against Kelley and Bertucci are based on the existence of an attorney-client relationship. "An attorney-client relationship may be implied when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance." *DeVaux v. Am. Home Assurance Co.*, 387 Mass. 814, 817–818, 444 N.E.2d 355 (1983). Regardless of whether Smith claims that such a relationship existed, he may proceed against Kelley and Bertucci on the theory that they were fiduciaries based on their knowledge and exploitation of Smith's reliance. The court additionally notes that in Massachusetts, attorneys are not "absolutely insulated from liability to nonclients." *Page v. Frazier*, 388 Mass. 55, 65, 445 N.E.2d 148 (1983). This theory, known as the foreseeable reliance exception, has two requirements. First, an attorney owes a duty only to nonclients "who the attorney knows will rely on the services rendered." *One Nat'l Bank v. Antonellis*, 80 F.3d 606, 609 (1st Cir.1996) (quoting *Robertson v. Gaston Snow & Ely Bartlett*, 404 Mass. 515, 524, 536 N.E.2d 344 (1989)). Second, "the court will not impose a duty of reasonable care on an attorney if such an independent duty would potentially conflict with the duty the attorney owes to his or her [actual] client." *One Nat'l Bank*, 80 F.3d at 609 (quoting *Lamare v. Basbanes*, 418 Mass. 274, 276, 636 N.E.2d 218 (1994)).

*Count XIII—RICO*

 To state a viable RICO claim, a plaintiff must allege four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The failure "to identify any enterprise, distinct from a named person defendant, is fatal under RICO." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 191 (1st Cir.1996). *See Odishelidze v. Aetna Life & Cas. Co.*, 853 F.2d 21, 23 (1st Cir.1988) (per curiam) (the person or persons "alleged to be engaged in a racketeering activity must be an entity distinct from the enterprise."). The term " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The existence of an enterprise is "proved by evidence of an ongoing organization, formal or informal, and by evidence that various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). "Such a group need not have a hierarchical structure or chain of command." *Boyle v. United States*, —— U.S. ——, 129 S.Ct. 2237, 2245, 173 L.Ed.2d 1265 (2009).

 To conduct or participate, directly or indirectly, in the affairs of an enterprise requires a showing that a defendant took "some part in directing the [enterprise's] affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). "Pattern of racketeering activity" means the commission of at least two related acts of racketeering activity over a span of time. *See Schultz*

*v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 731–732 (1st Cir.1996). The related "predicate" acts must have the same or similar purposes, participants, victims, or methods, or otherwise be interrelated by distinguishing characteristics and not simply be isolated events. *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 44 (1st Cir.1991). Plaintiffs must also demonstrate that their "injuries were caused by the predicate acts of wire and mail fraud." *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 17 (1st Cir.2000).

*Plaintiffs' RICO Theories*

 Plaintiffs assert an undifferentiated RICO claim against all defendants collectively. As best as can be discerned, plaintiffs allege that the RICO enterprise is of a "hub-and-spoke" variety, with Jenkins as the hub, and the defendant real estate companies and mortgage brokers as the spokes.[19] While a defendant "may be both a person and a member of a collective RICO enterprise," *In re Lupron Mktg. and Sales Prac. Litig.*, 295 F.Supp.2d 148, 173 (D.Mass.2003), the allegations as pled in the Amended Complaint are woefully insufficient to limn a viable RICO claim. There is no indication as to who are the proper RICO defendants, or what exactly is the RICO enterprise. The reader is left to guess among the cast of players as to which is which. Moreover, the predicate acts alleged are generic violations of the mail and wire fraud statutes. A RICO plaintiff must state "the time, place and content of the alleged mail and wire communication[s]" perpetrating the fraud. *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 291 (1st Cir.1987). The RICO claims will be *DISMISSED.*

---

**19.** The Supreme Court has cautioned against confusing "the common purpose of a single enterprise with the several, though similar, purposes of numerous separate enterprises of like character." *In re Pharm. Indus. Avg.*

*Wholesale Price Litig.*, 263 F.Supp.2d 172, 183 (D.Mass.2003) (citing *Kotteakos v. United States*, 328 U.S. 750, 769, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

*Count XII—Civil Conspiracy*

 The standard for stating a claim of civil conspiracy is more indulgent. A plaintiff may allege one of two types of conspiracy. The first type requires proof of coercion; the second requires proof of a common plan to commit a tortious act. *Kurker v. Hill,* 44 Mass.App.Ct. 184, 188, 689 N.E.2d 833 (1998). Under the first type of conspiracy, a plaintiff must allege that the defendant and others combined to have a special coercive power that they did not possess individually. *Aetna Cas. Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1563 (1st Cir.1994). To state a claim for the second type of conspiracy, the plaintiff must allege "first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." *Id.* at 1564. Unlike RICO, a plaintiff in a civil conspiracy claim need not allege a pattern of activity. Plaintiffs here have adequately alleged the second variant of a civil conspiracy claim against all defendants named in this count. Specifically, plaintiffs allege four distinct conspiracies to defraud them: (1) Jenkins, RE/MAX, Century 21, and NEMC with respect to the Dighton property; (2) Jenkins, RE/MAX, Century 21, and Union Capital with respect to the Boston property; (3) Jenkins and Union Capital with respect to the Brockton property; and (4) Jenkins and Mid–City with respect to the Whitman property. The motions to dismiss Count XII will be *DENIED.*

*Counts XIV and XVII—Declaratory Judgment and Injunctive Relief*

Declaratory judgment and injunctive relief are prayers for equitable relief, which the court need address only in the context of a judgment.

*Counts XV and XVI—Intentional and Negligent Infliction of Emotional Distress*

Intentional and negligent infliction of emotional distress claims raise issues of fact that are more appropriately addressed on a motion for summary judgment, if at all. Although the claims are mutually exclusive, plaintiffs are not required to make an election at this early stage of the pleadings. The motions to dismiss with respect to counts XV and XVI will be *DENIED.*

*ORDER*

For the foregoing reasons, defendants' motions to dismiss are *ALLOWED* in part and *DENIED* in part. Counts II and IV are *DISMISSED* in their entirety. Counts III and V are *DISMISSED* insofar as they seek recissionary relief; to the extent that they seek damages, Counts III and V remain viable. Count VI is *DIS-MISSED* to the extent that plaintiffs seek relief under section 11 of Mass. Gen. Laws ch. 93A. Count XIII is *DISMISSED.*

The parties shall, within fourteen (14) days of the date of this Order, submit a joint proposed discovery schedule.

SO ORDERED.