426 F.3d 524
 CONSOLIDATED EDISON, INC., Plaintiff-Counterclaim Defendant-Appellee-Cross-Appellant,
v.
NORTHEAST UTILITIES, Defendant-Counterclaim Plaintiff-Crossclaim Plaintiff-Appellant-Cross-Appellee, and
Robert Rimkoski, individually and on behalf of all others similarly situated, Intervenor Defendant-Counterclaim Plaintiff-Crossclaim Defendant-Appellee-Cross-Appellee.
Docket No. 04-5393(L)-CV.
Docket No. 04-5394(XAP)-CV.
 United States Court of Appeals, Second Circuit.
 Argued: June 8, 2005.
 Decided: October 12, 2005.
 
 Stuart J. Baskin, Shearman & Sterling LLP, New York, N.Y. (Kenneth M. Kramer and John Gueli, on the brief) for Consolidated Edison, Inc.
 Douglas M. Kraus, Skadden, Arps, Slate, Meagher & Flom LLP, New York, N.Y. (Joseph N. Sacca and Preeta D. Bansal, on the brief) for Northeast Utilities.
 Lawrence A. Sucharow, Goodkind Labaton Rudoff & Sucharow LLP, New York, N.Y. (Ira A. Schochet, Lisa Buckser-Schulz, and Barry Michael Okun, on the brief) for Robert Rimkoski.
 Before: JACOBS, LEVAL, and SACK, Circuit Judges.
 JACOBS, Circuit Judge.
 
 
 1
 On interlocutory appeal from two orders of the United States District Court for the Southern District of New York (Koeltl, J.), we are asked to resolve the following questions: [i] whether shareholders of Northeast Utilities ("NU") were granted a right as third-party beneficiaries to sue Consolidated Edison, Inc. ("CEI") for losses of over $1 billion that they allege resulted from CEI's breach of a contractual undertaking to merge with NU; and [ii] if so, whether the right to sue belongs to NU shareholders who held shares at the time CEI allegedly breached the merger agreement or to those NU shareholders who hold shares if and when a judgment is rendered against CEI. We answer the first question in the negative and therefore do not reach the second.
 
 BACKGROUND
 
 2
 This case arises from the failed multi-billion dollar merger between CEI and NU. Among the terms and conditions of the underlying merger agreement ("Agreement"), CEI agreed to purchase all of NU's outstanding shares for $3.6 billion—$1.2 billion over the prevailing market price. Consol. Edison, Inc. v. Ne. Utils., 249 F.Supp.2d 387, 390 (S.D.N.Y.2003) ("Con Ed I"); Consol. Edison, Inc. v. Ne. Utils., 318 F.Supp.2d 181, 183, 185 (S.D.N.Y.2004) ("Con Ed II").
 
 
 3
 On March 5, 2001, shortly before the scheduled closing, CEI declared that NU had suffered a material adverse change that "dramatically lowered" NU's valuation, and declined to proceed with the merger unless NU would agree to a lower share price. Con Ed I, 249 F.Supp.2d at 398. NU rejected the share-price reduction, treated CEI's demand as an anticipatory repudiation and breach of the Agreement, and declared that the merger was "effectively terminate[d]."
 
 
 4
 CEI brought suit against NU for (inter alia) breach of contract, fraudulent inducement, and negligent misrepresentation, while NU counterclaimed for breach of contract, alleging that CEI's proposed share-price reduction was attributable to buyer's remorse in a sinking stock market rather than any change in NU's condition. Id. at 390, 398-99. On cross-motions for partial summary judgment, the district court dismissed CEI's claims of fraudulent inducement and negligent misrepresentation, but allowed the dueling breach-of-contract claims to proceed. Id. at 422. The substance of those contract claims has little bearing on this appeal; at issue here is whether the $1.2 billion shareholder premium can be claimed as damages arising from CEI's alleged breach of the Agreement.
 
 
 5
 The district court ruled (at that juncture) that NU could sue on behalf of its shareholders for the $1.2 billion. Id. at 416-19. The court reasoned that [i] the merger agreement expressly designated NU's shareholders as intended third-party beneficiaries; [ii] as third-party beneficiaries, the shareholders could sue CEI for the allegedly wrongful failure to complete the merger, in order to recover the $1.2 billion premium they would have been paid after the merger closed; and [iii] CEI and NU stipulated that NU could sue "on behalf" of its shareholders. Id.
 
 
 6
 Afterward, Robert Rimkoski intervened as representative of a proposed class of persons holding NU shares on March 5, 2001 (the date of CEI's alleged breach of the Agreement) and asserted the same claim to the same $1.2 billion sought by NU. Rimkoski, who held NU shares on March 5, 2001, but who sold most of those shares thereafter, argued that under New York law: [i] the right to sue CEI for the $1.2 billion accrued on March 5, 2001; [ii] that right was not transferred automatically with any subsequent transfer of shares, Con Ed II, 318 F.Supp.2d at 185-87; and therefore, [iii] Rimkoski (and his proposed class of March 5, 2001 NU shareholders) has the right to sue CEI for the $1.2 billion, and NU—which undertakes to represent only those shareholders holding shares as of the date any judgment is entered against CEI (even if acquired after March 5, 2001)—does not. Id. at 185.
 
 
 7
 The district court agreed with Rimkoski. Id. at 195.[1] However, in light of the novelty of the question and its importance to this litigation, the court authorized NU to seek interlocutory appellate review of its ruling pursuant to 28 U.S.C. § 1292(b). Id. at 196. For essentially the same reasons, the district court also authorized CEI to seek an immediate appeal of its earlier ruling that NU shareholders are intended third-party beneficiaries under the Agreement who may sue CEI for the $1.2 billion premium. Id. at 196-97. On October 20, 2004, this Court granted NU and CEI's § 1292(b) applications for review.
 
 DISCUSSION
 
 8
 The questions presented on appeal were decided by the district court on various motions to dismiss and for summary judgment; our review is therefore de novo. See Greco v. Trauner, Cohen & Thomas, L.L.P., 412 F.3d 360, 363 (2d Cir.2005) (motion to dismiss); World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 165 (2d Cir.2003) (summary judgment).
 
 
 9
 * The first question presented is whether any NU shareholders (as of any date) enjoy the right, as third-party beneficiaries, to sue CEI for the $1.2 billion premium that CEI would have paid but for its allegedly wrongful failure to complete the merger.
 
 
 10
 New York law governs the Agreement. See Agreement, art. VIII, § 8.07. [A 308.] Under New York law, a contractual promise can be enforced by a non-party who is an intended third-party beneficiary of that promise. See Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 66 N.Y.2d 38, 43-44, 495 N.Y.S.2d 1, 485 N.E.2d 208 (1985); Restatement (Second) of Contracts § 302 & cmt. a (1981). A non-party is an intended third-party beneficiary if (inter alia) "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties." Restatement, supra, § 302; see also Fourth Ocean, 66 N.Y.2d at 45, 495 N.Y.S.2d 1, 485 N.E.2d 208 ("[W]e have emphasized when upholding the third party's right to enforce the contract . . . that the language of the contract. . . clearly evidences an intent to permit enforcement by the third party . . . ."). The question, therefore, is whether CEI and NU intended to confer on NU's shareholders a right to enforce CEI's promise to complete the merger (and thus a claim against CEI for the $1.2 billion premium). The answer is no. Undoubtedly, the merger agreement confers on NU's shareholders certain rights as third-party beneficiaries, so that after the "NU Effective Time," i.e., the moment at which the merger was to be complete, the shareholders could have enforced CEI's contractual obligation to pay them the $1.2 billion premium. However, as the NU Effective Time never arrived, CEI's duty to pay the premium did not arise.
 
 II
 
 11
 Our "fundamental objective" is to determine the intent of the contracting parties "as derived from the language employed in the contract." Abiele Contracting v. N.Y. City Sch. Constr. Auth., 91 N.Y.2d 1, 9, 666 N.Y.S.2d 970, 689 N.E.2d 864 (1997). "Where the contract is clear and unambiguous on its face, the courts must determine the intent of the parties from within the four corners of the instrument." Meccico v. Meccico, 76 N.Y.2d 822, 824, 559 N.Y.S.2d 974, 559 N.E.2d 668 (1990) (citation omitted). Here, the contract terms are ramified, cross-referenced, and complex, but they are not unclear. Cf. Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir.2005) (observing that, under New York law, a trial is required "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry" (quotation omitted)).
 
 
 12
 The Agreement treats third-party rights at article VIII, section 8.06. That provision states that there are none, with two exceptions:
 
 
 13
 This Agreement . . . (i) constitutes the entire agreement, and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter of this Agreement . . . and (ii) except for the provisions of Article II and Article 5.08, [is] not intended to confer upon any person other than the parties any rights or remedies.
 
 
 14
 Agreement, art. VIII, § 8.06 (emphasis added).
 
 
 15
 One exception to that foreclosure of third-party rights—article V, section 5.08—concerns the personal liability of CEI and NU's trustees, directors, and officers during and after the merger, and has no bearing on this case. The other—Article II—describes what occurs upon the arrival of the NU Effective Time, and is important. In particular, section 2.01(b) states that at the "NU Effective Time" each outstanding NU share "shall be converted into the right to receive" cash or stock in the post-merger company. Id., art. II, § 2.01(b)(ii), (ii)(A)-(B). That consideration would include the shareholder premium at issue here. Reading article VIII's general foreclosure of third-party beneficiary rights together with the exception in article II, section 2.01, we see that the only third-party right conferred on NU's shareholders is a right, arising upon completion of the merger, to receive payment for their shares. Since it is undisputed that the NU Effective Time never arrived, that right never arose.
 
 
 16
 NU and Rimkoski respond by invoking the principle of New York rule that a party may not avoid performance of a contractual duty by preventing the occurrence of a condition precedent (the so-called "prevention doctrine"). See, e.g., Kooleraire Serv. & Installation Corp. v. Bd. of Educ., 28 N.Y.2d 101, 106, 320 N.Y.S.2d 46, 268 N.E.2d 782 (1971). They argue, in a nutshell, that if CEI wrongfully prevented a merger that upon completion would have yielded the shareholder premium, the failure of the merger is no excuse for non-payment, and NU's shareholders may seek to recover the $1.2 billion premium from CEI. The district court relied heavily on the prevention doctrine in ruling that NU's shareholders can sue CEI. See Con Ed I, 249 F.Supp.2d at 417 n. 11. We disagree.
 
 
 17
 To create a third party right to enforce a contract, "the language of the contract" must "clearly evidence[] an intent to permit enforcement by the third party[.]" Fourth Ocean, 66 N.Y.2d at 45, 495 N.Y.S.2d 1, 485 N.E.2d 208 (emphasis added); see also LaSalle Nat'l Bank v. Ernst & Young LLP, 285 A.D.2d 101, 729 N.Y.S.2d 671, 676 (App. Div. 1st Dep't 2001) ("Absent clear contractual language evincing such intent, New York courts have demonstrated a reluctance to interpret circumstances to construe such an intent. . . ."). Here, the parties to the Agreement clearly created a third-party right, but just as clearly they took pains to assure that the right was limited to a right to collect the shareholder premium if and when the merger happened, not a right to sue to compel completion of the merger or for damages resulting from a party's refusal to merge. That intent is manifested in article VIII, which confers a third-party right on NU's shareholders in the context of a general foreclosure of such rights, and does so by reference to article II, which says nothing more than that the shareholders' right to payment would arise at the NU Effective Time. See Agreement, art. II, § 2.01(b) ("At the NU Effective Time . . . . each issued and outstanding NU Common Share . . . shall be converted into the right to receive [the merger consideration]" (emphasis added)).[2]
 
 
 18
 NU and Rimkoski are seeking to achieve through the prevention doctrine a right denied to them under the terms of the Agreement. But the prevention doctrine, where it applies, creates nothing more than an implied contractual obligation, similar to—and perhaps rooted in—the implied covenant of good faith and fair dealing. See, e.g., 9 Arthur L. Corbin, Corbin on Contracts § 947, at 721-22 (Interim ed.2002); 23 Richard A. Lord, Williston on Contracts § 63:26, at 528 (4th ed.2002); 13 id. § 39:6, at 527-32; Restatement, supra, § 245 cmt. a. The doctrine therefore exists to serve the intent of the parties, and does not operate at cross-purposes to that intent. See, e.g., Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) ("No obligation can be implied . . . which would be inconsistent with other terms of the contractual relationship."); Neuman v. Pike, 591 F.2d 191, 194 (2d Cir.1979) ("It is . . . well established in New York that, where the expressed intention of contracting parties is clear, a contrary intent will not be created by implication."); see also Fesseha v. TD Waterhouse Investor Servs., 305 A.D.2d 268, 761 N.Y.S.2d 22, 23 (App. Div. 1st Dep't 2003) ("While the covenant of good faith and fair dealing is implicit in every contract, it cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights."). NU and Rimkoski ask us to apply the prevention doctrine in a way that would transform a narrow right to secure payment if and when the NU Effective Time arises into a billion-dollar penalty for the failure to merge. We decline.
 
 III
 
 19
 The intent of CEI and NU to limit the third-party right (in the way set out above) is further manifested in the overall context and scheme of the Agreement. The express third-party right of NU shareholders to compel payment of the consideration due to them post-merger implements a contract right that NU could not enforce on their behalf: At and after the NU Effective Time, NU would no longer exist as an independent entity, but CEI would not yet have established the fund from which NU's shareholders would be paid. See Agreement, art. II, § 2.04. NU argues that even without the grant of such a third-party right, the shareholders may have been able to compel payment for their shares through claims of conversion, quasi-contract, implied contract, or accounting. That may be, but the most direct, simple, and potent remedy would be an action at law in contract; and that is exactly what the Agreement provides.
 
 
 20
 If we were to find a third-party right for shareholders to seek damages for breach of the duty to merge before the NU Effective time, that right would overwhelm the careful arrangements that the Agreement makes for that contingency, and would unduly limit the signatories' own freedom of action to accept or hazard the contractual consequences of non-performance.
 
 
 21
 Article VII, section 7.01 explains the circumstances under which the Agreement may be "terminated" by either party prior to the merger's completion. Section 7.01(e) provides that NU may terminate:
 
 
 22
 if CEI shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in Section 6.03(a) or (b), and (B) is incapable of being cured by CEI or is not cured by CEI within a reasonable period of time following receipt of written notice from NU of such breach or failure to perform.
 
 
 23
 (emphasis added). If, as NU alleges, CEI unjustifiably refused to complete the merger, CEI breached article VI, section 6.03(b)—which requires that CEI perform "in all material respects all obligations [] to be performed by it under this Agreement at or prior to the Closing Date"—and that breach was not cured within a reasonable time (ever, in fact) after NU's notice of breach. Thus, section 7.01(e) covers termination in the event of just such a breach as is alleged by NU.[3]
 
 
 24
 The effect of a section 7.01(e) termination is set out in section 7.02. The first part of section 7.02 states:
 
 
 25
 In the event of termination of this Agreement by either NU or CEI as provided in Section 7.01, this Agreement shall forthwith become null and void and have no effect, without any liability or obligation on the part of CEI or NU, other than the provisions of Section 3.01(q), Section 3.02(o), the penultimate sentence of Section 5.04(a), Section 5.09, this Section 7.02 and Article VIII, which provisions shall survive such termination . . . .
 
 
 26
 (emphasis added). Termination therefore would result in no "liability or obligation on the part of CEI" except for what is required by the provisions enumerated in section 7.02.
 
 
 27
 None of those provisions, however, provides support for the shareholders' right to sue CEI under these circumstances. Sections 3.01(q) and 3.02(o) ("Brokers"), and section 5.04 ("Access to Information; Confidentiality; Advice of Changes") have no bearing on this appeal. Section 5.09 ("Fees and Expenses") specifies fees and expenses owed by one party to the other. In particular, [i] CEI and NU agreed to share the costs of various regulatory filings and taxes associated with the merger, id. § 5.09(a); [ii] NU agreed to pay CEI a $110 million "Termination Fee" if, under certain circumstances, the Agreement were terminated and NU thereafter entered into an acquisition agreement with a third party, id. § 5.09(b); [iii] NU promised to pay a $20 million "expense reimbursement fee" to CEI if the Agreement were terminated under certain circumstances, id. § 5.09(c), and CEI made a similar promise, id. § 5.09(d); and [iv] NU agreed to cover CEI's costs and expenses if it were to prevail in any suit against NU to procure payment of the Termination Fee or expense reimbursement fee, id. § 5.09(e). None of these provisions contemplate the NU shareholders' right to sue CEI for the lost $1.2 billion premium; and any such right would overwhelm the specified and limited remedies available to each party in the event of breach and termination of the Agreement.
 
 
 28
 NU and Rimkoski emphasize that, by virtue of section 7.02, article VIII survives termination of the Agreement; and as discussed above, that article includes section 8.06, which refers to article II, which includes section 2.01, which refers to the shareholders' "right to receive" payment for their shares. This leads nowhere, however, for the reasons stated in Part II of this opinion. See supra, at 527-30.
 
 
 29
 That leaves the second part of section 7.02, which states that where "termination results from the willful and material breach by a party of any of its representations, warranties, covenants or agreements set forth in the Agreement":
 
 
 30
 such termination shall not relieve any party of any liability or damages resulting from its willful and material breach of this Agreement (including any such case in which a Termination Fee or any expense reimbursement fee is payable pursuant to Section 5.09), to the extent any such liability or damage suffered by the party entitled to such payment exceeds the amount of such payment . . . .
 
 
 31
 (emphasis added). This wording—which sets out the consequences of a "willful and material breach"—is at the heart of the matter, but this part of section 7.02 applies only to "liability or damage suffered by the party," not by non-parties, and therefore, not by NU's shareholders.
 
 
 32
 In sum, article VII—which governs breach and termination of the Agreement—provides no support for the shareholders' right to sue CEI for failure to complete the merger. To the contrary, that article reflects the parties' intent [i] to limit the damages resulting from a breach of the Agreement to those owed to each other; and even then, [ii] to liquidate and limit those damages, except in the case of a willful and material breach. By setting out and limiting the consequences of breach, the Agreement affords each party a critical power to abandon the merger if it is willing to suffer the stipulated consequences, a power that would be illusory if such abandonment could trigger a potential billion-dollar liability to the shareholders.
 
 
 33
 * * * * * *
 
 
 34
 Because we hold that no NU shareholder may sue CEI, we do not decode whether such a claim would be properly asserted by Rimkoski's proposed class of March 5, 2001 shareholders or NU on behalf of NU's shareholders as of the date any judgment is entered against CEI.
 
 CONCLUSION
 
 35
 For the foregoing reasons, we hold that shareholders of NU have no right to sue CEI for its alleged breach of the Agreement. Accordingly, we reverse the district court's March 21, 2003 opinion and order insofar as it denied CEI's motion for summary judgment as to NU's claim for the shareholder premium. Con Ed I, 249 F.Supp.2d at 416-19. We also reverse the district court's May 15, 2004 opinion and order insofar as it denied NU's motion for summary judgment on its crossclaim against Rimkoski (for declaratory judgment on Rimkoski's claim for the premium). Con Ed II, 318 F.Supp.2d at 195. This case is remanded for proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 This ruling left NU with its claim for $27 million in corporate lossesId. at 184-85.
 
 
 [2]
 Both shareholder classes contend that there is a clear third-party right to recover the lost premium even though the Agreement does not specify who would enjoy that right. That a billion dollars has drawn more than one group of claimants is no surprise; but it may be telling that in two careful opinions the district court entertained first one group and then the other (when it surfaced) as the sole third-party beneficiaries. While we do not need to decide as between these groups, the fact that each claim is arguable, may be evidence that no third-party right to recover the premium was conferred in the first place
 In this case there is a clear intent to grant a designated class of third-party beneficiaries the right to enjoy a specified fund (the proceeds of the consummated merger); in deciding in such a case whether there is a clear right to a different fund (the premium in the event of a failed transaction), it matters that the contract does not clearly designate the class to be benefitted by that right. We do not consider what might happen if, where parties clearly intend to create a third-party right to a specified fund, an error or lacuna in describing the beneficiary could frustrate that intent altogether.
 
 
 [3]
 NU contends, as it did in the district court, that the Agreement was not technically "terminated," and that article VII is therefore inapplicableSee Con Ed I, 249 F.Supp.2d at 415-16. However, the issue here is whether the parties intended NU's shareholders to have a right to sue CEI for failure to complete the merger. Article VII, the only part of the Agreement that describes the effect of a breach, is relevant to that question, whether it technically applies in this case or not.