**Janet BAKER, et al., Plaintiffs,**

v.

**GOLDMAN SACHS & CO., et al., Defendants.**

**Civil Action No. 09–10053–PBS.**

United States District Court, D. Massachusetts.

Sept. 15, 2009.

Terence K. Ankner, The Law offices of Partridge, Ankner & Horstmann, LLP, Boston, MA, Alan K. Cotler, Steven T. Voigt, Joan A. Yue, Reed Smith, LLP, Philadelphia, PA, for Plaintiffs.

John D. Donovan, Jr., Matthew L. McGinnis, Annmarie A. Tenn, Ropes & Gray LLP, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

This case arises out of the merger of Dragon Systems, Inc. ("Dragon") into Lernout & Hauspie Speech Products N.V. and its subsidiary (collectively "L & H") on June 7, 2000. Within months of the merger, the public disclosure of an accounting fraud scheme at L & H rendered L & H's stock worthless, and ultimately led L & H to file for bankruptcy on November 29, 2000.

Plaintiffs Janet and James Baker, the founders and controlling shareholders of Dragon, allege that defendant Goldman Sachs & Co. ("Goldman")[1] is liable to them for breach of contract and common law duties because it negligently advised Dragon to merge with L & H without engaging in adequate investigation of the value of L & H.[2]

Defendants move to dismiss all claims. After a hearing, the motion is **ALLOWED in part** and **DENIED in part.**

## II. FACTUAL BACKGROUND

When all reasonable inferences are drawn in favor of the non-moving party, the complaint alleges the following facts, many of which are disputed.

1. The Bakers have also sued the Goldman Sachs Group, Inc. and the Goldman Sachs & Co., LLC as defendants. They will collectively be called "Goldman."

2. The Bakers assert seven claims: (1) breach of fiduciary duty; (2) violation of the Massachusetts Unfair Trade Practices statute, Mass. Gen. Laws Ch. 93A; (3) breach of contract; (4)breach of contract/third party beneficiary; (5) breach of the implied covenant of good faith and fair dealing; (6) negligence; (7)neg-

### 1. Dragon's "Golden Eggs"

Founded in 1982, Dragon revolutionized the area of speech recognition technology. Compl. ¶ 8. In the late 1990s, "Dragon had an extensive research and development pipeline for future products and opportunities—Dragon's 'golden eggs.'" Pl.'s Mem. at 3. In order to effectively develop this technology, Dragon began to consider a merger with another company. At this time, Dragon's founders, Janet and James Baker, owned 51 percent of its stock. Compl. ¶¶ 2, 4. James Baker served for many years as Dragon's Chairman and Chief Executive Officer. His wife, Janet Baker, served as Dragon's President and succeeded him as Chairman and CEO. *Id.* ¶ 3. Janet Baker was a member of Dragon's Board of Directors at the time of Goldman's engagement and through the closing of the Dragon merger with L & H on June 7, 2000. *Id.*

### 2. Dragon Bait—The 1999 Engagement Letter

In the fall of 1999, L & H approached Dragon about a merger. At the time, Dragon was also discussing a potential merger with Visteon, a subsidiary of Ford. At this time, Dragon was valued at no less than $600 million. Compl. ¶ 12. In November 1999, Dragon decided to engage Goldman as its financial advisor. In its pitch to Dragon's Board of Directors, and to Janet Baker, Goldman promoted its ex-

ligent misrepresentation. The original complaint included nine claims but the Bakers did not press their claims for intentional misrepresentation and gross negligence, willful misconduct, and bad faith at the hearing on this motion. (Tr. 32). Even if the claims of fraud had been pressed, they failed to meet the heightened pleading requirements of Fed. R.Civ.P. 9(b) because it is unclear in the complaint what specific statements were alleged to be intentionally false.

perience, expertise in investment banking, high reputation for professionalism, international resources, and the "real value" Goldman would add "in maximizing transaction value and negotiating definitive agreements." *Id.* ¶ 14. Goldman knew that Dragon was a privately held corporation, that the Bakers were the founders and majority owners, and that any transaction would require the Bakers' approval. *Id.* ¶ 15.

On December 8, 1999, Ellen Chamberlain, Dragon's Chief Financial Officer, signed an Engagement Agreement on behalf of Dragon. *Id.* ¶ 16. The agreement was addressed to Chamberlain, Janet Baker and Donald Waite, the Executive Vice President and Chief Administrative Officer of Seagate Technology, Inc. ("Seagate"), which held shares of Dragon stock. Neither Baker nor Waite were addressed in their representative capacity. With a salutation that reads "Ladies and Gentleman," the agreement provides:

> We are pleased to confirm the arrangements under which Goldman, Sachs & Co. ("Goldman Sachs") is exclusively engaged by Dragon Systems, Inc. (the "Company") as financial advisor in connection with the possible sale of all or a portion of the Company.
>
> During the term of our engagement, we will provide *you* with financial advice and assistance in connection with this potential transaction, which may include performing valuation analyses, searching for a purchaser acceptable to you, coordinating visits of potential purchasers and assisting you in negotiating the financial aspects of the transaction.

Compl. Ex. B at 1 (emphasis added). Under the agreement, Dragon would be paying Goldman's fee. Significantly, it also provided:

> Please note that any written or oral advice provided by Goldman Sachs in

connection with our engagement is exclusively for the information of the Board of Directors and senior management of the Company, and may not be disclosed to any third party or circulated or referred to publicly without our prior written consent.

Compl. Ex. B at 4.

Annex A of the Engagement Agreement ("Annex A") which governs possible derivative actions, states,

> The Company, Seagate Technology, and Janet M. Baker also agree that neither Goldman Sachs nor any of such affiliates, partners, directors, agents, employees or controlling persons shall have any liability to the Company, Seagate Technology, Inc., Janet M. Baker or any person asserting claims on behalf of or in right of the Company in connection with or as a result of either our agreement or any matter referred to in this letter except to the extent that any losses, claims, damages, liabilities, or expenses incurred by the Company result from the gross negligence, willful misconduct or bad faith of Goldman Sachs in performing the services that are the subject of this letter.

Janet Baker and Donald L. Waite signed as stockholders "agreeing only as the fifth sentence of Annex A." Annex A also provides that the letter agreement shall be construed under New York law. *See* Compl. Ex. B, Annex A.

A follow-up letter dated March 31, 2000 referred to the "engagement letter dated December 2, 1999 between" Goldman and Dragon. Again, Waite and Baker signed as shareholders "agreeing only to the fifth sentence of Annex A." Compl. Ex. C.

### 3. *The Deal with L & H*

Early in the negotiations, the consideration L & H offered for Dragon was an

equal mix of cash and stock. Compl. ¶¶ 34, 36. This changed at a critical meeting between Dragon and L & H on March 8, 2000, where L & H informed Dragon and the Bakers that, in light of another merger/acquisition deal with Dictaphone in which L & H was involved, L & H would have .to change the offer for the Dragon merger to all stock with no cash component. *Id.* ¶ 36. In plaintiff's view, this change in the structure of the deal should have signaled to Goldman that L & H could not raise the amount of cash needed for a mixed stock and cash transaction. Plaintiffs believe that this was a significant red flag that L & H's stock was not worth its trading price. *Id.* ¶ 42.

#### 4. *Goldman's Prior Investigation of L & H*

In 1998, Goldman undertook an analysis of L & H on behalf of another client, GE Capital, that was considering an investment of $25 million or less in L & H. Through this investigation, Goldman learned that at least one of L & H's strategic partners was "related" to L & H. Compl. ¶¶ 41, 44, 77. L & H's strategic partners were companies that supposedly developed translation capabilities for numerous languages and dialects around the world and then licensed or sold this technology to L & H. *Id.* ¶¶ 74–75. Goldman's 1998 investigation revealed that one of these partners, Flanders Language Valley (FLV), which was represented as a "third party investment entity," was in fact closely related to L & H. The founders of L & H, Jo Lernout and Pol Hauspie, resigned from the board of FLV "due to the conflicts of interest that had become apparent." *Id.* ¶ 77. Plaintiffs believed this should have served as another warning sign for Goldman.

As part of its evaluation of L & H's financial health for GE Capital, Goldman

contacted at least two L & H customers. *Id.* ¶¶ 89, 91. Furthermore, Goldman devised various strategies for GE Capital to "hedge some of the stock price risk" with its investment. *Id.* ¶ 41.

By contrast, during its engagement by Dragon, Goldman did not contact L & H's customers to determine whether they were in fact customers of L & H or to understand their relationships with L & H. *Id.* ¶ 88. Goldman also represented to Dragon that L & H's stock value was not an open issue or concern. *Id.* ¶ 61.

#### 5. *Goldman's Due Diligence Obligations*

On December 14, 1999, Goldman sent the Bakers and others a copy of "Due Diligence Questions" regarding L & H that included the following issues of inquiry: financial information from 1996 through December 1999, organic sales growth, assets and liabilities, major customers and their contracts, research and development budgets, and the manner of L & H's integration of its acquisitions into its business. Compl. ¶ 45. On December 16 and 17, 1999, Goldman submitted two memoranda, which compared and contrasted possible acquisitions of Dragon by L & H and Visteon. *Id.* ¶¶ 46, 52. The December 17 memorandum also included a "Merger Analysis" stating Goldman's various estimates for revenue and debt for a combined company if L & H purchased Dragon with "100% Stock," "100% Cash", or "50% Stock/50% Cash." *Id.* ¶ 52. The plaintiffs' complaint alleges that when Goldman provided these calculations to the Bakers and Dragon's Board of Directors, it had not done any of the necessary investigation, research, review, or analysis. *Id.*

In addition, Goldman was uniquely positioned to investigate, research, review and analyze L & H's Asian growth and revenues, a significant factor in Dragon's con-

sideration of the merger deal, because Goldman had offices in Singapore and South Korea, where L & H's Asian growth was concentrated. Compl. ¶ 67. Nevertheless, Goldman allegedly did not investigate the critical area of L & H's Asian growth and revenues, or that it conducted such a negligent analysis that it failed to discover what a Wall Street Journal reporter learned with only a few phone calls—that most of L & H's Asian business was a sham. *Id.* ¶ 69.

During Goldman's allegedly negligent analysis of L & H in the context of the potential Dragon merger, Goldman attended two Dragon Board of Directors meetings by teleconference on December 17 and 20, 1999. The Bakers attended also these meetings, where Goldman presented historical financial information about L & H and financial forecasts in the event of a merger. *Id.* ¶¶ 109, 110. Goldman actively took steps to allay the concerns of the Bakers and others at Dragon about L & H by arranging for a teleconference with Goldman analysts in Europe who knew L & H. *Id.* ¶ 116. During these teleconferences, Goldman's analysts provided positive representations about L & H.

Goldman also gave favorable advice about the merger at the March 27, 2000 meeting of Dragon's Board of Directors when Dragon approved the Merger Agreement. The Bakers attended this meeting as well. *Id.* ¶ 111.

### 6. *Trapped*

In reliance on Goldman's advice, the Bakers executed the Merger Agreement on March 27, 2000, and proceeded to close the deal on June 7, 2000. Compl. ¶ 117. Goldman received a $5 million fee.

On August 8, 2000, *The Wall Street Journal* reported that "some companies L & H has identified as Korean customers say they do no business at all with L & H." *Id.* ¶ 136.

On November 20, 2000, an Audit Committee commissioned by L & H in August 2000 concluded that L & H had improperly recorded at least $277 Million in income from the beginning of 1998 through the first half of 2000. *Id.* ¶¶ 138, 140. On November 29, 2000, L & H filed for protection from its creditors under Chapter 11 of the United States Bankruptcy code. *Id.* ¶ 141. On April 27, 2001, L & H announced at a shareholders meeting that in addition to the $277 Million the Audit Committee had already identified as being misreported, L & H had reported an additional $96 million of income that did not exist. *Id.* ¶ 143. L & H's stock became worthless, and the Bakers lost approximately $300 million, along with the intellectual property they had worked 18 years to develop.

Plaintiffs allege Goldman did virtually nothing to verify the representations L & H made to Dragon and the Bakers, particularly with respect to L & H's Asian business operations. *See, e.g.,* Compl. ¶¶ 37, 40, 48–50, 69. In addition, plaintiffs allege that Goldman misrepresented what it knew about L & H and completely failed to advise Dragon and the Bakers about the risks of an all-stock deal with L & H or about strategies to protect their investment and intellectual property. *See, e.g.,* Compl. ¶ 41. The Complaint goes on to state that Goldman provided a favorable outlook on L & H's prospects that contrasted with negative reports previously issued by stock analysts at Goldman, and that Goldman failed to disclose certain conflicts of interest. *Id.* ¶¶ 79–80. Among other things, the Bakers claim that Goldman had provided financial advisory services to L & H and traded its stock. *Id.* ¶ 120.

It is on the basis of these facts that the Bakers base their various claims for relief against Goldman.

## III. DISCUSSION

### A. *Motion to Dismiss Standard*

In order to survive a motion to dismiss, "a complaint must allege 'a plausible entitlement to relief.'" *Rodriguez–Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir.2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

In considering a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6), courts "must take the allegations in the plaintiff's pleadings as true and must make all reasonable inferences in favor of the plaintiff." *Rivera v. Rhode Island*, 402 F.3d 27, 33 (1st Cir.2005). Nevertheless, "courts have no duty 'to conjure up unpleaded facts that might turn a frivolous claim . . . into a substantial one.'" *Bell Atl. Corp.*, 550 U.S. at 562, 127 S.Ct. 1955 (quoting *O'Brien v. DiGrazia*, 544 F.2d 543, 546, n. 3 (1st Cir.1976)). "The court need not accept a plaintiff's assertion that a factual allegation satisfies an element of a claim, however, nor must a court infer from the assertion of a legal conclusion that factual allegations could be made that would justify drawing such a conclusion." *Cordero–Hernandez v. Hernandez–Ballesteros*, 449 F.3d 240, 244 n. 3 (1st Cir.2006) (internal citations omitted).

### B. *Breach of Contract*[3] *(Count III)*

Defendants contend that the Bakers have no cause of action for breach of contract because the Bakers were not parties to the Engagement Agreement between Dragon and Goldman, and that Goldman's duties ran exclusively to Dragon. The Bakers respond that Goldman owed them a direct contractual duty independent of the contractual duty it owed to Dragon. The Bakers predicate this argument on the language of the second sentence of the Engagement Agreement, which reads,

> During the term of our engagement, we will provide *you* with financial advice and assistance in connection with this potential transaction, which may include performing valuation analyses, searching for a purchaser acceptable to you, coordinating visits of potential purchasers and assisting you in negotiating the financial aspects of the transaction.

Compl. Ex. B at 1 (emphasis added). Construing the word "you" to include Janet Baker, an addressee of the Engagement Agreement, the Bakers contend that Goldman contracted to provide services directly to her, as Dragon's president and (together with her husband) controlling shareholder, and not solely to Dragon as a corporation.

 Pursuant to the terms of the Engagement Letter, all contractual disputes are controlled by New York law. Under New York law, "[t]he words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning." *Brooke Group Ltd. v. JCH Syndicate 488*, 87 N.Y.2d 530, 534, 640 N.Y.S.2d 479, 663 N.E.2d 635, 638 (N.Y.1996). In addition, "it is . . . 'a cardinal principle of contract construction[ ] that a document should be read to give effect to all its provisions and to render them consistent with each other.'" *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir.2002)

---

3. The parties dispute whether Massachusetts or New York law applies, but agree that with respect to the current dispute there are no substantive differences between the two. The contract, however, stipulates that it is governed by New York law. Other than the contractual issues, the Court will rely on both Massachusetts and New York law.

(quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (U.S.1995)).

 Reading the plain language of the contract as a whole, the Court concludes that the contract was between Dragon and Goldman.[4] Chamberlain, Dragon's CFO, was the only person who signed the main body of the contract. While it is true that Goldman addressed the agreement to Janet Baker and used the word "you" instead of "Company" to describe the scope of the engagement, the only part of the contract to which Ms. Baker agreed, as evidenced by her signature, was the fifth sentence of Annex A. In addition, the Engagement Agreement contemplated the payment of consideration only by Dragon, not Janet Baker. For a contract to be valid under New York law, there must be "an offer, acceptance, consideration, mutual assent, and intent to be bound." *Int'l Business Machines Corp. v. Johnson,* 629 F.Supp.2d 321, 330 (S.D.N.Y. 2009) (applying New York law) (internal citations omitted); *see also* Restatement (Second) of Contracts § 52 (2009) ("An offer can be accepted only by a person whom it invites to furnish the consideration.").

This Court does not need to reach the question of the Engagement Letter's use of the term "you" in place of "company" in order to determine that Janet Baker was not intended to be a party to the contract. Even if we assumed, for the purposes of argument, that Goldman extended an offer to Janet Baker, the fact that she did not sign or agree to the main body of the contract negates the existence of a con-

tractual relationship between Goldman and Janet Baker.

Accordingly, when the document is read as a whole, it is clear that the intent behind the parties' actions was to create a contract between Dragon and Goldman, not between Goldman and Dragon's shareholders. The Court therefore ***ALLOWS*** the motion to dismiss with respect to Count III.

### C. *Breach of Contract/Third Party Beneficiary (Count IV)*

Plaintiffs also assert that they are entitled to recover as third party beneficiaries. This argument has greater force.

 "It is ancient law in New York that to succeed on a third party beneficiary theory, a non-party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no duty is owed." *Madeira v. Affordable Housing Foundation, Inc.,* 469 F.3d 219, 251 (2d Cir.2006) (quoting *County of Suffolk v. Long Island Lighting Co.,* 728 F.2d 52, 63 (2d Cir.1984)) (applying New York law). "An intended third party beneficiary will be found when it is appropriate to recognize a right to performance in the third party and the circumstances indicate that the promisee *intends* to give the third party the benefit of the promised performance." *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 573 (2d Cir. 1991) (citing Restatement (Second) of Contracts § 302 (1981))(emphasis added). Moreover, the parties' intent to benefit the third party must clearly appear in the

---

4. The parties disagree on the meaning of the term "exclusively engage" in the Engagement Agreement. Defendants argue it means Dragon was Goldman's exclusive client. Plaintiff argues that it means Goldman was the exclusive investment banker acting as a financial advisor to Dragon. However, because Ms. Chamberlain, Dragon's CFO, was the only party to sign the body of the contract, and because the contract only contemplated the provision of consideration by Dragon, the textual dispute between the parties is not a determinative issue.

language of the contract. *See, e.g., Consolidated Edison, Inc. v. Northeast Utilities,* 426 F.3d 524, 528 (2d Cir.2005) (applying New York law).

■ Here, plaintiffs point to contractual language in the Engagement Agreement that expressly shows a clear and definite intent by the contracting parties, Dragon and Goldman, to benefit Janet Baker. At the time of Goldman's engagement by Dragon, Janet Baker was a member of Dragon's Board of Directors, a key player in the negotiations between Dragon and Goldman, and a majority shareholder (together with her husband). Specifically, the Engagement Agreement states "any written or oral advice provided by Goldman Sachs in connection with our engagement *is exclusively for the information of the Board of Directors* and senior management of the Company." (Emphasis added). While Goldman was hired by Dragon, the Engagement Agreement showed an express intent on Goldman's part to benefit members of Dragon's Board of Directors.

Goldman argues that it referred to the Board of Directors in a representative capacity. However, Goldman not only addressed the Engagement Agreement to Janet Baker in her individual capacity, but also used the word "you" rather than "company" when discussing Goldman's duty to provide "financial advice and assistance." This is not a mere semantic quibble, but a reflection of Goldman's understanding that others would benefit from its advice. The Engagement Agreement defined Dragon as "the Company" but chose to use the more general term "you" while describing its duties under the contract. The Court finds that "you" should be given its plain meaning, and therefore interprets "you" to refer to each of the addressees of the Engagement Letter.

In addition, Goldman dealt directly and persistently with Janet Baker and with James Baker throughout the course of the engagement. *See, e.g.,* Compl. ¶¶ 45–47, 52–53, 59, 109–111, 116.

The face of the contract does not, however, reflect an intent to benefit James Baker. At the time the Engagement Letter was executed, Mr. Baker was not on the Board of Directors, was not a signatory of the Letter, and was not an addressee. *See U.S. Borax & Chem. Corp. v. Szmokaluk,* 1981 WL 404963 at *5 (Del.Super.Ct.1981) ("A stockholder cannot sue on a corporate contract, to which he is not a party, unless he qualifies as a third-party beneficiary under the contract").

When all reasonable inferences are drawn in favor of the Bakers, the allegations in the Complaint are sufficient to evidence an intent by Goldman and Dragon to benefit Janet Baker as an individual, but not James Baker. Accordingly, the Court **DENIES** the motion to dismiss Count IV with respect to Janet Baker, and **ALLOWS** the motion with respect to James Baker.

**D. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count V)**

■ In addition to their breach of contract claims, the Bakers have alleged breach of the implied covenant of good faith and fair dealing. Under New York law, "implicit in every contract is a promise of good faith and fair dealing which is breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreements." *See Skillgames, LLC v. Brody,* 1 A.D.3d 247, 252, 767 N.Y.S.2d 418, 423 (N.Y.App.Div. 2003) (citing *Rowe v. Great Atl. & Pac. Tea Co.,* 46 N.Y.2d 62, 68, 412 N.Y.S.2d

827, 385 N.E.2d 566, 569 (N.Y.1978)). Since the Court has found that Janet Baker has sufficiently alleged that she was a third-party beneficiary of the contract between Dragon and Goldman, she may proceed with her claim for breach of the implied covenant of good faith and fair dealing.

The Court **DENIES** the motion to dismiss Count V of the complaint with respect to Janet Baker, and **ALLOWS** the motion with respect to James Baker.

### E. *Fiduciary Duty (Count I)* [5]

■■■■ Goldman contends that it owed the Bakers no fiduciary duty. " '[W]hether a person is a fiduciary in a particular situation is a question of law and fact.' " *Frommert v. Conkright*, 433 F.3d 254, 271 (2d Cir.2006) (quoting *Gray v. Briggs*, 1998 WL 386177, at *3 (S.D.N.Y.1998)). "[A] fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Penato v. George*, 52 A.D.2d 939, 942, 383 N.Y.S.2d 900 (N.Y.App.Div.1976). The duty exists when one places trust in another's specialized judgment and advice. *Doe v. Harbor Schs., Inc.*, 843 N.E.2d 1058, 1064, 446 Mass. 245, 251 (Mass.2006) (citing *Van Brode Group, Inc. v. Bowditch & Dewey*, 633 N.E.2d 424, 428, 36 Mass.App. Ct. 509, 516 (Mass.App.Ct.1994)). However,

> [t]he plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature. The catalyst in such a change is the defendant's knowledge of the plaintiff's reliance upon him.

*Smith v. Jenkins*, 626 F.Supp.2d 155, 171 (D.Mass.2009) (quoting *Broomfield v. Ko-sow*, 212 N.E.2d 556, 560, 349 Mass. 749, 755 (Mass.1965)) (internal quotation marks omitted).

■■■■ The relationship between a claim of breach of fiduciary duties and breach of contract is not always clear. A fiduciary duty is an extra-contractual duty. *Cf. In re Daisy Sys. Corp.*, 97 F.3d 1171, 1175, 1180 (9th Cir.1996) (rejecting the argument that a fiduciary duty was limited by the terms of the engagement letter). As such, the plaintiff must "set[ ] forth allegations that, *apart from the terms of the contract . . .* the parties created a relationship of higher trust than would arise from [their contracts] alone so as to permit a cause of action for breach of a fiduciary duty independent of the contractual duties." *Brooks v. Key Trust Co. Nat'l Ass'n*, 26 A.D.3d 628, 630–31, 809 N.Y.S.2d 270, 272–73 (N.Y.App.Div.2006) (citing *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 21, 799 N.Y.S.2d 170, 832 N.E.2d 26, 31 (N.Y.2005)) (dismissing breach of fiduciary duty claim as duplicative of contract claim).

In some circumstances, the contract's terms may preclude the assertion of a fiduciary duty. *See, e.g., CIBC Bank & Trust Co. (Cayman) v. Credit Lyonnais*, 270 A.D.2d 138, 139, 704 N.Y.S.2d 574, 575 (N.Y.App.Div.2000) (affirming dismissal of claim against investment bank where contract contradicted existence of fiduciary relationship). In an attempt to argue that fiduciary duties should be precluded in the instant case, defendants rely heavily on *Joyce v. Morgan Stanley & Co.*, 538 F.3d 797 (7th Cir.2008), in which the Seventh Circuit dismissed a shareholders' claim for breach of fiduciary duty against a corporation's financial advisor because, among

---

**5.** The parties do not brief whether Massachusetts or New York law control but seem to agree that the governing standard is the same.

other reasons, the Court saw no way that shareholders could "show that their relationship with [the investment bank] possessed the 'special circumstances' necessary to give rise to an extra-contractual fiduciary duty." *Id.* at 802. In reaching that conclusion, the Seventh Circuit emphasized that the engagement letter, which defined the advising relationship, "explicitly noted that Morgan Stanley was working only for the corporation." *Id.*

■ Here, the relationship among the parties is muddy. Goldman undertook to provide investment advice to Dragon's senior management and the Board of Directors, of which Janet Baker was a member. There is no explicit waiver in the Engagement Letter precluding an extra-contractual fiduciary duty, as there was in *Joyce.* In their Complaint, the Bakers have alleged that they put faith, confidence, and trust in Goldman's specialized judgment and advice and that Goldman not only knew about the Bakers' faith, but also actively solicited it. As alleged, the Bakers were the central players in the transaction, not mere bystanders as in the typical shareholder suit. In fact, Goldman continuously initiated communications and meeting with the Bakers throughout late 1999 and early 2000. Therefore, the Court finds that plaintiffs have made sufficient allegations that special circumstances existed to create a fiduciary relationship apart from the terms of the contract of which Janet Baker is allegedly the third-party beneficiary. Again, a closer issue exists with respect to her husband, but the parties have not pressed the distinction. When all reasonable inferences are drawn in his favor, the Court concludes he has a viable claim as well.

Accordingly, the Court *DENIES* the motion to dismiss with respect to Count I.

## F. *Negligence and Negligent Misrepresentation (Counts VI–VII)*

Goldman contends that the plaintiffs have no cause of action for negligence or negligent misrepresentation because Goldman owed no duty of care to the Bakers.

Both the negligence and the negligent misrepresentation claim hinge on whether or not Goldman owed the Bakers a duty of care. The limitations on liability, however, are stricter for claims of negligent misrepresentation. In this case, the Court finds that the plaintiffs have alleged sufficient facts to survive a motion to dismiss a negligent misrepresentation claim, and therefore they must have alleged sufficient facts for the less-rigorous negligence claim. Therefore, the Court will analyze the limitations on liability for negligent misrepresentation under both Massachusetts and New York law rather than treating the claims separately.

■ Massachusetts courts have adopted the definition of negligent misrepresentation set forth in Section 552 of the Restatement (Second) of Torts (1977):

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Nycal Corp. v. KPMG Peat Marwick LLP,* 688 N.E.2d 1368, 1371, 426 Mass. 491, 496 (Mass.1998). The *Nycal* court established a liability standard for negligent misrepresentation claims against accountants, holding that liability is limited "to noncontractual third parties who can demonstrate 'actual knowledge on the part of account-

ants of the limited—though unnamed—group of potential [third parties] that will rely on the [report], as well as actual knowledge of the particular financial transaction that such information is designed to influence.'" *Nycal,* 426 Mass. 491, 688 N.E.2d 1368, 1372 (quoting *First Nat'l Bank of Commerce v. Monco Agency, Inc.,* 911 F.2d 1053, 1062 (5th Cir.1990)) (alterations in original). Negligent representation claims made against accountants are substantively similar to the instant case, in that third parties such as investors are relying on reports and recommendations made by an outside agency under contract to provide information and advice.

■ Defendants contend that, in the context of accounting professionals, the New York courts have declined to impose liability to third parties with whom the accountants are not in near-privity. *See e.g., Liberty Mut. Ins. Co. v. First Brighton Transp. Mgmt., Inc.,* No. CV–07–715, 2008 WL 1787684, at \*4 (E.D.N.Y. April 17, 2008) (negligent misrepresentation claim requires a "relationship sufficiently approaching privity"). However, New York's near-privity test is not entirely inflexible. A litigant may satisfy the test by showing " '(1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance.'" *Id.* at \*4 (quoting *Parrott v. Coopers and Lybrand, LLP,* 95 N.Y.2d 479, 484, 718 N.Y.S.2d 709, 741 N.E.2d 506, 508 (N.Y.2000)).

■ Defendants point out that one court ruled that an investment bank retained by a corporate board owed the shareholders no duty because there was no "relationship substantially approaching privity." *Meyer v. Goldman Sachs & Co.,* 234 A.D.2d 129, 130, 651 N.Y.S.2d 304, 305 (N.Y.App.Div.1996) (a two-paragraph opinion). The *Meyer* opinion does not describe with specificity the relationship between the plaintiff shareholders and the defendant investment bank. However, New York courts have recognized a cause of action where there were repeated representations to the plaintiff shareholder over an extended period of time. *See European Am. Bank & Trust Co. v. Strauhs & Kaye,* 65 N.Y.2d 536, 554, 493 N.Y.S.2d 435, 483 N.E.2d 110, 120 (N.Y.1985) (allowing cause of action for negligence against accounting firm where "the parties remained in direct communication, both orally and in writing, and, indeed, met together throughout the course of [the business] relationship"); *see also Sec. Pac. Bus. Credit, Inc. v. Peat Marwick Main & Co.,* 79 N.Y.2d 695, 703, 586 N.Y.S.2d 87, 597 N.E.2d 1080, 1084 (N.Y.1992) (listing the following factors as supporting a near-privity relationship: (1) defendant was retained for the purpose of benefitting the noncontractual third party, (2) the third party had direct dealing with the defendant, and (3) the defendant knowingly provided the third party with a copy of its reports or findings).

■ Throughout the period of time when Goldman acted as financial advisor to Dragon, Goldman had continuous contacts with both Janet and James Baker. *See, e.g.,* Compl. §§ 45–46, 52, 54–55, 59 (describing numerous email communication, initiated by both the Bakers and Goldman, along with meetings attended jointly by the parties). At the time of these communications with the plaintiffs, Goldman allegedly had specific knowledge that the Bakers, through their status as founders and majority shareholders of Dragon, were relying on Goldman to competently investigate and provide advice on potential trans-

actions that would affect the Bakers' largest financial asset. Compl. ¶ 20.

Thus, under either New York or Massachusetts law, plaintiffs have alleged sufficient facts to demonstrate that Goldman did owe the Bakers a duty of due care. The Court **DENIES** the motion to dismiss Counts VI and VII, encompassing the negligence and negligent misrepresentation claims.

### G. Chapter 93A (Count II)

Plaintiffs have asserted a claim under Chapter 93A of the General Laws of Massachusetts, alleging that defendants have committed "unfair and deceptive act[s] or practice[s]" in the context of Dragon's merger with L & H. *See* Mass. Gen. Laws ch. 93A, § 11 (2009). Defendants argue that the court must dismiss the Bakers' claim because "the Bakers do not qualify as persons 'engaged in the conduct of any trade or commerce,' contemplated by the statute, as no commercial business transaction occurred between the Bakers in their individual capacities and Goldman." Def.'s Mem. 18 (quoting Mass. Gen. Laws ch. 93A, § 11).

 To maintain a claim under Chapter 93A, a plaintiff need not establish privity of contract, " 'so long as the parties are engaged in more than a minor or insignificant business relationship.' " *Giuffrida v. High Country Investor*, 897 N.E.2d 82, 95, 73 Mass.App.Ct. 225, 238 (2008) (quoting *Standard Register Co. v. Bolton–Emerson, Inc.*, 649 N.E.2d 791, 795, 38 Mass.App.Ct. 545, 551 (1995); *Reisman v. KPMG Peat Marwick LLP*, 787 N.E.2d 1060, 1078, 57 Mass.App.Ct. 100, 125 (2003)). One Massachusetts court recently held that the plaintiffs could maintain their Chapter 93A claims "even though [the defendant] dealt with the plaintiffs as officers and shareholders," due to the fact that the plaintiffs had continuously communicated with the defendants regarding the sale of a company for a period of one month. *Giuffrida*, 897 N.E.2d at 95. Another court gave significant weight to the fact that a defendant "was in direct contact" with shareholder plaintiffs throughout a transaction involving the corporation. *See Reisman*, 787 N.E.2d at 1078.

 In the instant case, plaintiffs have alleged that the defendants engaged in continuous communication with them throughout the period in which Goldman was advising Dragon on the potential merger with L & H. Therefore, the Court finds that the allegations in the Bakers' complaint supports the conclusion that the relationship between Goldman and the Bakers was more than "trivial." *See Reisman*, 787 N.E.2d at 1078 (holding that controlling shareholders in a corporation which was bought by another corporation in a stock-for-stock merger had a cause of action under Chapter 93A against the accounting firm that verified the purchasing corporation's financial information for the plaintiff).

Having found that the Bakers have alleged a non-trivial business relationship with Goldman, the Court **DENIES** the motion to dismiss Count II of the Complaint.

### H. Standing [6]

 Goldman contends that the Bakers lack standing because none of their claims are direct in nature and Janet Baker relinquished the right to bring any of the current claims derivatively by signing

---

**6.** Defendants assert, and Plaintiffs do not seem to disagree, that the issue of standing is governed by Delaware law, as Dragon was incorporated in Delaware. *See In re Sonus Networks, Inc.*, 499 F.3d 47, 64 (1st Cir.2007).

the Engagement Agreement as to sentence 5 of Annex A. Because the Court has determined that some of the claims are direct, the standing argument fails. *See Dowling v. Narragansett Capital Corp.*, 735 F.Supp. 1105, 1113 (D.R.I.1990) ("[I]f the injury in question is one sustained by the shareholders, directly, they may sue on their own behalf.").

### ORDER

The Court ***ALLOWS*** the motion to dismiss with respect to Count III (breach of contract); Count VIII (intentional misrepresentation) and Count IX (willful misconduct, and bad faith). The Court ***ALLOWS*** defendants' motion to dismiss Counts IV and V (third party beneficiary and implied covenant of good faith and fair dealing) with respect to James Baker. The Court ***DENIES*** the motion to dismiss with respect to the remaining counts. The Court ***DENIES*** without prejudice the motion to dismiss the related Goldman entities.[7]

---

7. The relationship between Goldman Sachs & Co. and the related Goldman entities is unclear from the parties' briefing. The Court will permit discovery on this issue in order to clarify each defendant's relationship to the Bakers, and their respective liabilities in this case.